DOE RUN LEAD COMPANY and ST. JOSEPH LEAD
COMPANY v. SAMUEL R. MAYNARD et al., Ap-
pellants.
DOE RUN LEAD COMPANY and ST. JOSEPH LEAD
COMPANY v. ROBERT HOLMES et al., Appel-
lants.

In Banc, July 12, 1920.

1. CORPORATION: Dissolution: Appeal. A proceeding for the dis-
solution of a corporation, brought by it against dissenting stock-
holders, in which evidence is heard and considered, is a civil ac-
tion, involving the exercise of judicial power, and from a judg-
ment of dissolution an appeal is not prohibited by the Constitu-
tion, and such dissenting stockholders are, therefore, under the
statute, entitled to appeal.

2. ——: ——: ——: Final Judgment. A judgment by which
the court adjudges and decrees that the corporate charter and
franchise of a corporation be surrendered and cancelled, that its
corporate existence be forever ended and that its officers as stat-
utory trustees take charge of its assets and affairs and administer
them, is a final judgment, from which an appeal lies.

3. ——: ——: ——: Aggrieved Party. Appellant is not re-
quired, in order to be entitled to an appeal, to establish that his
legal rights have been prejudiced by the judgment. The statute
merely requires the affiant to state in the affidavit for an appeal
that he "believes" the appellant is "aggrieved" by the judgment.

4. ——: ——: Pleading: Petition Only. Although the statutes
pertaining to the dissolution of a corporation provide for no plead-
ings except the petition, the code procedure is available for pre-
senting in an orderly method issues of law or fact.

5. ——: ——: Civil Action: Legal or Equitable. The nature of
the issues determines whether the civil case is an action at law or
a suit in equity. A suit to dissolve a corporation, brought by the
company against dissenting stockholders, in which is involved
the creation and administration of a trust and in which the cor-
poration pleads estoppel *in pais* against the minority stockholders,
is a suit in equity, because the issues call for equitable relief.

6. ——: ——: Estoppel: Knowledge: Inactivity. Estoppel *in pais*
does not arise from notice and inaction alone. A stockholder is
not estopped to deny the legality of an attempted dissolution of
a corporation by the fact that he knew a majority of its stock-

Doe Run Lead Co. v. Maynard.

holders were scheming and planning to purchase its stock with the stock of another, and took no steps to stop them. The fact that some of the. stockholders exercised their right to sell their stock and are making no complaint, and that. the other company bought certain shares, it being neither alleged nor proven that it lost by the investment, does not affect the right of the dissenting stockholders to question the attempted dissolution..

7. ———: ———: ———: **Elements.** To constitute estoppel *in pais* there must have been (a) false representation or concealment of material facts, (b) made with knowledge of the facts, (c) to a party ignorant of their truth, (d) with the intention that the other should act upon it and (e) such other must have been induced to act upon it; and to be available it must be alleged and proven that such other has been misled to his hurt.

8. ———: ———: **Discretionary Right: Stock in Another.** The statute (Sec. 2996, R. S. 1909) declaring that a "corporation may be dissolved by a judgment or decree of the circuit court" upon the adoption of a resolution by "the stockholders holding two-thirds in value of all the shares of stock" does not give to a majority of the stockholders an absolute right to a decree of dissolution, nor does it confer upon a minority an absolute power to prevent dissolution. Nor does said statute vest in the majority a right, under color of dissolution, to compel the minority to take stock in a new corporation in lieu of their stock.

9. ———: ———: **Fixing Price of Stock.** A majority of stockholders of .a corporation, desiring dissolution, do not have the right to fix the price of the stock of the dissenting stockholders, or to compel them to accept it. The stock belonging to them is their private property, and private property (with certain constitutional exceptions) cannot, without the consent of the owner, be taken for private use by any majority, however great, nor by the payment of any price, however large.

10. ———: ———: **Consolidation With Another: Payment in Stock.** Where the purpose of the majority of the stockholders of a solvent lead-mining corporation is to effect a consolidation with another, and to effect the consolidation by issuing to all the stockholders stock in the other on fair terms, or to pay to those who will not come in a fair value for their shares, dissolution cannot be effected against the consent of dissenting stockholders. That would not be a real dissolution, but only a pretended dissolution. Minority stockholders cannot be compelled to surrender their stock and accept stock in another company in lieu of it; nor can they be compelled to sell their stock, or to surrender it for money, except upon a real dissolution, which, under the statutes, implies a sale of the assets, the payment of its debts, and the distribution of the proceeds among the stockholders.

11. ———: ———: ———: **Mining · Company.** A lead-mining corporation, even by unanimous action of its stockholders, cannot effect a consolidation with another lead-mining corporation by selling all its stock to the other and then dissolving itself. The statute (Sec. 3360, R. S. 1909) declares the public policy of the State and limits the right of consolidation to corporations organized solely for manufacturing purposes, and a lead-mining company is not such a corporation. And the rule is the same where the company seeking to dissolve itself and to consolidate with the other is a domestic corporation and the other is a foreign corporation.

12. ———: ———: **Good Faith.** The proceeding to dissolve a corporation must be in good faith, by which is meant that the dissolution must be intended to culminate in a cessation of corporate life and the distribution of its assets. Good faith does not involve an inquiry into the motive, but it does imply an inquiry into the purpose of the proceeding, as to whether that purpose is the one contemplated by the statute. An attempt by the stockholders of one company, who are stockholders and officers of another, to have the one absorb the other and thus bring about a consolidation of the two, for the purpose of lessening the amount of income taxes whose payment a separate existence makes necessary, by the indirect method of dissolving the one to be absorbed and issuing to its stockholders· the stock of the other, is not a proceeding in good faith for dissolution. Such a proceeding is an attempt to use the law of dissolution as a law of consolidation, and is not therefore in good faith.

13. ———: ———: **Status Quo.** The difficulty or impossibility of restoring the *status quo ante*, if brought about by an attempt to wrest the law from its purpose, and to violate its spirit while professing to observe its letter, does not commend itself to the indulgence of courts, or deserve their assistance.

Appeal from St. Francois Circuit Court.—*Hon. Peter Huck,* Judge.

REVERSED.

*A. L. McCawley* and *Warner, Dean, McLeod & Langworthy* for appellant.

(1) The resolution favoring dissolution, upon which this proceeding·is based, and claimed to have been adopted at a special stockholders' meeting of Doe Run Lead Company was not adopted by stockholders holding two-

Doe Run Lead Co. v. Maynard.

thirds in value of all the shares of stock in the company. The charter and license of the St. Joseph Lead Company did not authorize the ownership and voting of stock of another corporation. (a) For the purposes of determining its right to own and vote stock in a Missouri corporation, the St. Joseph Lead Company could have no greater powers than a Missouri corporation. Sec. 3037, R. S. 1909; Head v. Ins. Co., 241 Mo. 413; State ex rel. v. Cook, 171 Mo. 362; National Lead Co. v. Paint Store Co., 80 Mo. App. 271. (b) The Constitution and statutes of Missouri, do not authorize a domestic business and manufacturing corporation to own and vote stock in another business and manufacturing corporation, but deny such right. Sec. 7, Art. 12, Mo. Constitution; Secs. 2990, 3346, R. S. 1909. The charter and laws under which a corporation is organized or licensed must be strictly construed. Blair v. Perpetual Ins. Co., 10 Mo. 565; Matthews v. Skinker, 62 Mo. 331; Carroll v. Campbell, 108 Mo. 559; State ex rel. Light Co. v. Murphy, 130 Mo. 24; State ex rel. Crow v. Lincoln Trust Co., 144 Mo. 587; Watson Seminary v. County Court, 149 Mo. 70; Prairie Slough Club v. Kessler, 252 Mo. 434; 1 Morawetz on Private Corporations, sec. 431; Parsons v. Tacoma Co., 25 Wash. 492; Thomas v. Railroad Co., 101 U. S. 82; Schwab v. Potter Co., 194 N. Y. 415, 418; Franklin Co. v. Savings Bank, 68 Me. 45. (c) Reference to other sections of the Missouri Statutes, shows conclusively that the Legislature did not intend to grant to manufacturing and business corporations the right to subscribe for, own and vote stock in other manufacturing and business corporations. R. S. 1909, secs. 3346, 1124, 3080, 3081, 3316. (d) It is contrary to the public policy of the State for one manufacturing and business corporation to subscribe for, own and vote stock in another business and manufacturing corporation. Hanlon Millinery Co. v. Trust Co., 251 Mo. 574; State ex rel. v. Bank, 157 Mo. App. 563; Newland Hotel Co. v. Furniture Co., 73 Mo. App. 135; State ex inf. v. Lincoln Trust Co., 144 Mo. 562: Anglo-American Land Co. v. Lombard, (C. C. A.) 132

Fed. 736; Central Life Sec. Co. v. Smith, 236 Fed. 175; Franklin Co. v. Savings Bank, 68 Me. 43; People ex rel. Peabody v. Trust Co., 130 Ill. 269; Converse v. Emerson-Talcott & Co., 242 Ill. 619; Dunbar v. American Tel. & Tel. Co., 224 Ill. 22; Irvine v. Chicago Co., 200 Fed. 953; Central Railroad Co. v. Collins, 40 Ga. 628; Kean v. Johnson, 9 N. J. Eq. 407; Black v. Del. & Raritan Canal Co., 24 N. J. Eq. 474; De La Vergne Co. v. Savings Inst., 175 U. S. 54. The cases of State ex inf. v. Mo. Pac. Ry. Co., 237 Mo. 338; State ex inf. v. Mo. Pac. Ry. Co., 241 Mo. 1, and Tanner v. Lindell Ry. Co., 180 Mo. 1, relied upon by respondents, are distinguishable from the case at bar. The exceptions mentioned in those cases are such as to make them really authorities in favor of appellant under the facts of this case. (e) At the time the resolution for dissolution was voted upon, the total paid up capital stock of The Doe Run Lead Company was $10,000,000, and the resolution therefore failed to carry by the requisite two-thirds vote. Sec. 2996, R. S. 1909, requires that the resolution favoring a dissolution must be voted by "stockholders holding at least two-thirds in value of all the shares of stock in said corporation." It is alleged that only 65,783 shares of stock were issued and outstanding, but the facts show that there were 100,000 shares of paid up and issued stock in said corporation, and that the resolution failed to carry. The certificate of the Secretary of State is conclusive. R. S. 1909, sec. 3356. This is admitted by respondents. The action of the company with reference to an alleged treasury stock account was illegal. Chrisman-Sawyer Banking Co. v. Mfg. Co., 168 Mo. 646; Hazard v. Wight, 201 N. Y. 403. The fact that certificates were not issued for a portion of these shares is immaterial. Knapp v. George Knapp & Co., 127 Mo. 71; Williams v. Everett, 200 S. W. 1050; Armour Bros. Banking Co. v. St. Louis Natl. Bank, 113 Mo. 20; Schaeffer v. Mo. Home Ins. Co., 46 Mo. 250; Kimball v. Davis, 52 Mo. App. 207; Pacific Nat. Bank v. Eaton, 141 U. S. 234; Burr v. Wilcox, 22 N. Y. 555; Flour City Natl. Bank v. Shire 84 N. Y. Supp. 813;

Field v. Pierce, 102 Mass. 261; U. S. Radiator Co. v. New York, 208 N. Y. 149; Carthage Natl. Bank v. Poole, 160 Mo. App. 143. (2) This proceeding is not a bona-fide dissolution proceeding such as is authorized by the dissolution statute. The evidence shows that the purpose of this proceeding is to enable St. Joseph Lead Company to consolidate with Doe Run Lead Company, and compel the minority stockholders to sell out their interests to the majority stockholders at a price fixed by the majority. A dissolution statute cannot be made use of to accomplish such purposes. In re Paine, 166 N. W. 1037; Theis v. Gas Light Co., 34 Wash. 23. The facts of the two foregoing cases are almost identical with those in the case at bar, and in each of them a decree of dissolution was denied. Riker & Son Co. v. United Drug Co., 79 N. J. Eq. 582; Ervin v. Oregon Ry. & Nav. Co., 27 Fed. 625, cited with approval in Tanner v. Lindell, 190 Mo. 20; Chicago Hansom Cab Co. v. Yerkes, 141 Ill. 335; Byrne v. Elec. Mfg. Co., 65 Conn. 336; Taylor v. Porter, 4 Hill (N. Y.) 143. (3) The proposed dissolution is prejudicial to the minority stockholders. The dissolution statute requires the court to find that the proposed dissolution of the corporation is not prejudicial to the stockholders. R. S. 1909, sec. 2999. The men elected as directors of Doe Run Lead Company through the Chubb transaction were all interested directors dominated by St. Joseph Lead Company, and attempted to make a sale to the St. Joseph Lead Company upon its own terms. The transactions thus attempted to be consummated are illegal. Kitchen v. Ry. Co., 69 Mo. 261; Ashton v. Penfield, 233 Mo. 427; Bent v. Priest, 86 Mo. 482; Bent v. Priest, 10 Mo. App. 556; Hill v. Coal Mining Co., 119 Mo. 23; Hannerty v. Theater Co., 109 Mo. 310; Michoud v. Girod, 45 U. S. (4 How.) 555; Jackson v. Ludeling, 88 U. S. (21 Wall.) 616; Symmes v. Union Trust Co., 60 Fed. 864; Mason v. Pewabic Mining Co., 133 U. S. 58. (4) The appellant is not estopped from opposing the dissolution of Doe Run Lead Company. The present plan of dissolution is a new one for the purpose of evading taxes. There

is no ground for invoking the doctrine of estoppel. Harrison v. McReynolds, 183 Mo. 548; Keeney v. McVoy, 206 Mo. 57; Mills v. Railroad, 41 N. J. Eq. 9; Teele v. Granite Co., 224 Mass. 24; State ex rel. v. Bankers Trust Co., 157 Mo. App. 568. (5) the dissolution statute as construed by the trial court is unconstitutional. The Doe Run Lead Company was organized in 1886, thirteen years before the dissolution statute was enacted. Laws 1899, pp. 116, 117. The statute should not be construed to be retroactive. State ex rel. Parker v. Thompson, 41 Mo. 28; Bartlett v. Ball, 142 Mo. 35; State ex rel. v. Greer, 78 Mo. 188; Mutual Ins. Co. v. Flynn, 38 Mo. 483. The stockholders have a contractual right to have the company continued during the entire period of its incorporation. 2 Cook on Corporations (6 Ed.), secs. 492, 494: Tanner v. Lindell Ry. Co., 180 Mo. 16; Feld v. Roanoke Inv. Co., 123 Mo. 603; Luehrman v. Trust & Title Co., 192 S. W. (Mo.) 1032. The statute was construed by the trial court to be retroactive and as so construed is unconstitutional. Trustees of Dartmouth College v. Woodward, 4 Wheat, 520; State ex rel. Haeussler v. Greer, 78 Mo. 188; Farrington v. Tennessee, 95 U. S. 679; Clearwater v. Meredith, 68 U. S. 39; Covington Turnpike Co. v. Sandford, 164 U. S. 593; State Bank of Ohio v. Knoop, 57 U. S. (16 How.) 380; Wilmington Railroad v. Reid, 80 U. S. (13 Wall.) 264. (6) The motion to dismiss the appeals should be overruled. (a) While the remedy by appeal was unknown at common law and rests upon statute, contained in the general code of civil procedure, authorizes an appeal in this case. Sec. 2038, R. S. 1909. The dissolution statute calls for a hearing and a judgment and decree and contemplates a judicial proceeding. Secs. 2996-3000, R. S. 1909. An appeal may be taken from a judgment under the dissolution statute. In re Switzer, 201 Mo. 87; Nolan v. Johns, 108 Mo. 431; State ex rel. v. Lewis, 76 Mo. 370; State ex rel. v. Shelton, 238 Mo. 281; State v. Schneider, 47 Mo. App. 669; Stid v. Railroad, 211 Mo. 418; 3 C. J. p. 318, sec. 31. (b) Under the provisions of the Code of Civil Procedure,

an appeal will lie from the judgment of a circuit court in a statutory proceeding, where the procedure is according to the course of common law trials, regardless of whether there is any specific right of appeal granted by such special statute. Sec. 2038, R. S. 1909. The mere fact that the proceeding is statutory does not prevent an appeal. Appeals are allowed in other statutory proceedings without a special provision for appeal. R. S. 1909, secs. 5425-5427, 5434, 2360, 2369, 2370-2381, 2535, 2559. The dissolution statute calls for a judicial determination of the question involved. Luehrman v. Lincoln Trust & Title Co., 192 S. W. 1033.

*Boyle & Priest, Nagel & Kirby* and *Edward A. Rozier* for respondent.

(1) This proceeding is not judicial, nor to determine litigated rights. The remedy for voluntary corporate dissolution provided by Secs. 2996-3000, R. S. 1909, is a special statutory proceeding, administrative, not judicial, in its nature. (a) The proceeding is not *stricti juris* either at law or in equity; it is not a ''civil cause,'' but is a special statutory proceeding not known to the common law, and is intended to be summary, and the judgment final. The statute so shows. (b) The petition differs from that in ordinary civil causes. (c) The petition is not filed against anyone. (d) The procedure is ''complete within itself.'' (e) No provision is made allowing an appeal. (f) The intention not to allow an appeal, and that the judgment be final appears. (g) The judgment is ''self-executing.'' (2) The remedy by appeal, having been unknown to the common law, rests entirely upon statute, and the right to appeal exists only if and to the extent expressly provided by statute. State ex rel. v. Woodson, 128 Mo. 514; Bussier's Adm. v. Sayman, 257 Mo. 308; Thomas v. Elliott, 215 Mo. 602; 3 C. J. p. 316, sec. 29. (3) No appeal lies from the judgment of a court (even of general jurisdiction), in a special statutory proceeding not known to

the common law, unless the right of appeal is expressly granted. Ackerman v. Green, 201 Mo. 243; Lindell's Admr. v. Railroad, 36 Mo. 545; State ex rel. v. Schofield, 41 Mo. 41; Hannibal Railroad v. Morton, 20 Mo. 74; Wilson v. School Tp., 23 Mo. 417; 3 C. J. 375, sec. 133; Davenport v. Jones, 126 Pa. St. 273; Randolph v. City, 172 Ind. 510; Harvey v. Pealer, 63 Mich. 574; Marlowe v. Commonwealth, 142 Ky. 106; Sparrow v. Circuit Judge, 109 Mich. 272; Clancy v. Board of Comm., 150 Wis. 633; Tadlock v. Texas Comm., 21 Tex. 166. Under above rule the courts of this State have held that statutory proceedings in a county court to disincorporate or incorporate a town, or to establish or vacate roads, are not judicial in nature, but are administrative or ministerial, hence no appeal lies unless expressly granted. In re Town of Arcadia, 201 S. W. 359; Hall v. DeArmond, 46 Mo. App. 597; Aldridge v. Spears, 101 Mo. 406; St. Louis, I. M. & S. v. City of St. Louis, 92 Mo. 165. (4) Moreover, special statutory proceedings not known to and not according to the course of the common law, are not "civil causes" within the meaning of general statutes which grant appeals in civil cases. 3 C. J. 325, sec. 42; Wetherall v. Harris, 51 Mo. 65; Moore v. Buyer, 42 Ohio St. 312; State ex rel. v. Commrs., 31 Ohio St. 451; French v. Lighty, 9 Ind. 476; Barger v. Cochran, 15 Ohio St. 460; Moore v. Mayfield, 47 Ill. 167; Phillips v. Corbin, 25 Col. 62; Ex parte Pierce, 5 Maine, 324; Young v. Blaisdell, 138 Mass. 344-6; Coates v. Woodward, 22 R. I. 562; Valentine v. Boston, 20 Pick. (Mass.) 201; In re Sanborn's Appeal, 107 Mich. 189. The rule applies to statutory proceedings to dissolve business and municipal corporations, and to incorporate the latter. Cady v. Mfg. Co., 48 Mich. 133; Commonwealth v. Tradesmen Tr. Co., 237 Pa. St. 316-7; (5) There can be no question that at the common law no judicial remedy existed for the voluntary dissolution 201 S. W. 359-360; Hall v. De Armond, 46 Mo. App. 596. Chamberlain v. Rochester Co., 7 Hun, (N. Y.) 557; In re Binghamton El. Co., 143 N. Y. 261; Town of Arcadia,

of a corporation. State ex rel. Donnell v. Foster, 225 Mo. 171, at 192-3. (6) The history or derivation of the Missouri dissolution statutes shows that the Legislature did not intend to grant a right of appeal in such proceedings. 3 Rev. Stat. N. Y. 1875, ch. 8, art. 3; N. Y. Code Civ. Pro., Title II, ch. 17, secs. 2419-31; In Matter of Hulbert Bros. Co., 160 N. Y. 14-15; Cady v. Knit Goods Co., 48 Mich. 133; Chamberlain v. Rochester Co., 7 Hun, 558; In re Binghamton El. Co., 143 N. Y. 261. (7) The appellants have no such immediate personal pecuniary or property interest or legal rights involved in this proceeding, nor are such rights determined, nor can appellants be so aggrieved by the judgment, as to entitle them to an appeal, within the meaning of the rule. (a) They have no property or contract right to have the corporate life continue. At the common law a mere majority of the members of a corporation had the power to surrender its franchise, and when the surrender was accepted by the sovereign the corporation was dissolved. No person has a property or vested interest in any mere rule of law. Employers' Liabilities Cases, 223 U. S. 50. (b) The common law did not recognize the existence of any implied contract between shareholders that the corporation could not be dissolved, except with the consent of all. On the contrary, the common law rule was that the majority could dissolve against the wishes of a minority, but when the majority sought to exercise said power fraudulently or unfairly as to the minority, a rule in equity protected the latter according to the circumstances of each case. 10 Cyc. 1302; 2 Cook (7 Ed.), sec. 629; 1 Morawitz on Priv. Corp. (2 Ed.) sec. 413; Tanner v. Lindell Ry., 180 Mo. 1; Treadwell v. Salisbury Mfg. Co., 7 Gray (Mass.) 393; Bowditch v. Jackson Co., 76 N. H. 351; State ex rel. v. Chilhowee W. M. Co., 115 Tenn. 296; Wilson v. Prop. of Central Bridge, 9 R. I. 590; Biedenkopf v. Ins. Co., 160 Iowa, 643; 30 Harvard Law Review, p. 4; Laumann v. Lebanon Railroad, 30 Pa. St. 46; Ervin v. Oregon Co., 27 Fed. 625. Even if it be con-

ceded (for argument only) that appellants had the right to insist on the corporation continuing, they cannot litigate such right in this proceeding. R. S. 1909, secs. 2996-3000; Sutherland on Stat. Const. (1 Ed.) sec. 392; (d) Appellants are not aggrieved by the judgment, nor have any issue to which they are adversary parties, nor any of their legal rights, been judicially determined. R. S. 1909, secs. 2996-3000; (8) The resolution "favoring dissolution" which was adopted at a special meeting of the stockholders of the Doe Run Lead Company on May 16, 1916, was adopted by stockholders holding more than two-thirds in value of all the shares of stock in said company, as required by the statute. R. S. 1909, sec. 2996. (a) The St. Joseph Lead Company had the power and the right to own and vote the shares of stock owned by it in The Doe Run Lead Company, and its vote upon the resolution favoring the dissolution is therefore valid. State ex inf. Hadley v. Mo. Pac. Ry., 237 Mo. 347; State ex inf. Hadley v. Mo. Pac. Ry., 241 Mo. 12; Hill v. Nesbit, 100 Ind. 349; 1 Cook on Corp. (7 Ed.) sec. 314. (b) The total issued and outstanding shares of Doe Run stock numbered 65,783, not 100,000; therefore the vote of 64,612 shares in favor of dissolution was cast by the persons holding more than two-thirds of the stock. (9) This proceeding is a bona-fide dissolution proceeding of the kind authorized by the Missouri statute. The uncontroverted evidence so shows. (a) The Missouri consolidation statute applies only to a consolidation of Missouri corporations, and neither said statute nor public policy forbid a foreign corporation licensed in Missouri, from acquiring and operating the property and business of a Missouri corporation. Sec. 3360, R. S. 1909; State ex. inf. v. Cont. Tob. Co., 177 Mo. 3. (b) The purpose of this proceeding is not (as Maynard's counsel contend),to "freeze out the minority stockholders." (c) This proceeding is an incidental step in the plan adopted by more than two hundred Doe Run stockholders, the primary purpose of which was to merge the two properties. (10) The dissolution is not prejudicial

to the shareholders. Counsel misconceive the scope and purpose of this proceeding. It is merely to enable the state to ascertain whether its interests will be prejudiced by permitting the desired dissolution. (11) Maynard's conduct has estopped him from opposing the dissolution, as he seeks to do through his opposition to this proceeding. Tanner v. Lindell Ry., 180 Mo. 1; Laumann v. Lebanon Railroad, 30 Pa. St. 42; Bowditch v. Jackson Co., 76 N. H. 351; Cook on Corp. (7 Ed.) sec. 629; Francis v. Taylor, 31 N. Y. Misc. 187, 52 N. Y. App. Div. 631; Windmuller v. Distilling Co., 114 Fed. 491, 115 Fed. 748. (12) The dissolution is not prejudicial to the public welfare. (13) Maynard's laches and acquiescence should preclude his objections from consideration. Lack of diligence forfeits relief. Troll v. City, 257 Mo. 663; Loomis v. Mo. Pac., 165 Mo. 495. When the effort is to set aside or attack executed transactions, equity requires prompt action. Burgess v. St. Louis Ry., 99 Mo. 508; Taylor v. Short, 107 Mo. 393; Morgan Co. v. Halderman, 254 Mo. 648. The rule of laches and acquiscence applies to efforts by stockholders to set aside corporate transactions. Tanner v. Lindell Ry., 180 Mo. 18; Johnson v. United Rys. Co., 243 Mo. 297; Loomis v. Mo. Pac., 165 Mo. 495. Maynard and Holmes as stockholders are presumed to have known all that the corporate books and records disclosed, as well as what the evidence shows they did know. Johnson v. Rys., 243 Mo. 297; Kitchen v. Ry., 69 Mo. 226; Feld v. Roanoke Co., 123 Mo. 618. (14) Equity will not decree a rescission when the status has completely changed and the rights of third persons have intervened, or where it is plainly impracticable for the court to restore the *status quo.* Johnson v. Railroad, 227 Mo. 451.

WILLIAMSON, J.—This is a proceeding by the Doe Run Lead Company, incorporated, for dissolution under the provisions of Sections 2996 to 3000, inclusive, Revised Statutes 1909. Samuel R. Maynard and Robert Holmes, objecting stockholders, and the St. Joseph Lead

Company filed answers. Upon a hearing below, a decree of dissolution was entered and from that decree Samuel· R. Maynard and Robert Holmes have duly, but separately, appealed. The two appeals have been consolidated, however, and will be decided as one.

The pleadings are voluminous; the evidence covers some twelve hundred pages; the property interests involved are large; the questions presented for our determination are numerous, and many of them are important. The petition, covering twenty-four pages, exclusive of exhibits, avers in substance, omiting formal allegations, that a resolution authorizing the filing of this proceeding for the dissolution of petitioner was duly adopted by the holders of more than two-thirds of the capital stock of the petitioning corporation; that for reasons covering some eighteen printed pages, it is to the best interests of its stockholders that the properties of the petitioner shall be consolidaed with the properties of the St. Joseph Lead Mining Company, incorporated, which is a corporation engaged in the same line of business in the same locality as petitioner, and is a party to these actions; and that those stockholders of the petitioner "*who now desire a dissolution of said company, also desire that all the property and business of the Doe Run Lead Company be first sold*" to the St. Joseph Lead Company, and it is then averred that they (that is, the stockholders of petitioner who desire that its properties be sold to the· St. Joseph Lead Company) also "*desire that said sale and transfer be made upon a basis which will fairly and fully compensate such minority stockholders of the Doe Run Lead Company as may object to such sale, transfer and dissolution, by liquidating their respective interests in the Doe Run Lead Company, either in shares of stock of the St. Joseph Lead Company or in cash,*" but that (*in substance*) *if that arrangement cannot be made, then that the properties of petitioner be sold at public sale.* (The italics are ours.) The prayer is for a decree of dissolution and for an order directing the proper officials of petitioner to take charge of its assets as trustees, as

provided by Section 2995, Revised Statutes 1909, and for such further orders as may be appropriate. A demurrer to this petition, based upon constitutional and various other grounds, including that of a failure to state facts sufficient to constitute a cause of action, was overruled, and, as above stated, defendants Maynard, Holmes and the St. Joseph Lead Company filed answers.

The answer of appellant Maynard consisted of a general denial and the following affirmative defenses:

1. That the dissolution had not been authorized by stockholders holding and entitled to vote two-thirds of the value of all the shares of stock.

2. That the defendant, the St. Joseph Lead Company, which claimed to own more than two-thirds of all the shares of stock in a Missouri corporation, and that its attempt to do so was in violation of the laws and public policy of this State.

3. That the joint committee of stockholders which had been appointed to arrange the terms of the consolidation of the two corporations had not acted in good faith, but had been controlled by the St. Joseph Company.

4. That the resolution authorizing the dissolution is void because in violation of the laws of this State, in that it contemplated the purchase by the Doe Run Lead Company of its own capital stock.

5. That the resolution of dissolution had been abandoned and had not been accepted by the St. Joseph Company, and that neither of the two corporations had attempted to proceed under or in accordance with the resolution for more than three years after the adoption thereof, and that conditions in the meantime had so changed as to make the resolution inapplicable.

6. That the resolution was illegal and void because the owners of a majority of the capital stock of the Doe Run Company had been coerced into consenting thereto by certain persons who were in control of the St. Joseph Company.

7. That the petitioner cannot maintain an action under the provisions of Sections 2996 to 3000 inclusive,

Revised Statutes 1909, because the same were enacted long subsequent to the incorporation of the petitioner, and are not retroactive in their operation, and that to permit a dissolution to be decreed under the provisions of said sections would be in violation of certain sections named, of the Constitution of the State of Missouri, and of certain amendments to the Constitution of the United States, particularly the due-process-of-law provision, and those relating to taking private property for private use, and impairing the obligations of a contract.

8.   That the resolution authorizing a dissolution of the petitioner was not legally adopted, for the reason that the St. Joseph Company could not vote the shares of stock it claimed to own, and that to so construe Section 2996, supra, as to permit such stock to be voted would be in violation of Sections 5 and 7 of Article XII of the Missouri Constitution.

9.   That all contracts between the said two corporations by or through which the St. Joseph Company exercised control over the Doe Run Company were made in violation of Chapter 98, Revised Statutes, 1909, relating to pools, trusts and combinations, in violation of the Federal Anti-Trust Law, and of the Clayton Act; and are prejudicial to the public welfare, and that the proceeding is not a proceeding on the part of the Doe Run Company stockholders for the dissolution of that company, but is a suit by the St. Joseph Company for the dissolution of the Doe Run Company.

Certain other defenses are also set forth in this answer, and in the answer of Holmes, but need not here be stated.   The issues made by the answer of defendant Maynard substantially cover all of the defenses alleged in the other answers.   The answer of defendant Holmes also alleged the proceeding to be an attempt on the part of the St. Joseph Company, as owner of more than two-thirds of the stock of the Doe Run Company, to force a sale of all the property of the Doe Run Company to the St. Joseph Company.

The defendant St. Joseph Lead Company, by its answer, admitted all of the allegations contained in the petition, and consented that a decree of dissolution should be entered, and alleged that the defendant Maynard was estopped to object to the decree of dissolution, for the reason that although he has been at all times during the pendency of the negotiations looking to dissolution, a stockholder in both companies and fully acquainted with all those proceedings, he made no objection thereto; that the St. Joseph Company had purchased more than ninety four per cent of the Doe Run Company stock in an effort to execute the proposed consolidation and merger; that those purchases were made with the full knowledge of defendant Maynard and without objection on his part; that it was now impossible to restore the *status quo,* and that the said Maynard was thereby estopped from opposing the decree of dissolution.

The petitioner filed a reply to the answer of Maynard, setting up substantially the same matters alleged in the answer of the St. Joseph Company. The foregoing is as much of the pleadings as it is necessary to set forth.

A detailed statement of the contents of the record would be so voluminous as to tend to confuse rather than to elucidate, and is unnecessary. For that reason only so much of the facts as may be thought to be essential to an understanding of the questions presented and decided, or which tend to shed light upon those questions, will be stated.

The petitioner, the Doe Run Company, is a corporation which was organized under the laws of the State of Missouri in 1886, for the general purpose of lead-mining. Apparently all of its property is located in this State. Its capital stock originally consisted of two thousand shares of stock of the par value of one hundred dollars each, but at the time of the institution of these proceedings it had been increased to ten million dollars. Certificates of stock had been issued and were outstanding for 65,783 shares. The par value of the stock is

$100.  Appellants own something more than 1,100 shares of Doe Run Company stock.

Closely allied to the Doe Run Company is the St. Joseph Lead Company, a corporation organized under the laws of the State of New York in 1884, with a capital stock originally of one million dollars. By successive changes the capital was ultimately increased to twenty million dollars, of which ten millions, of the par value of ten dollars per share, had been issued. The general purpose of the St. Joseph Company was the same as that of the Doe Run Company. At the time of the institution of this action, Clinton H. Crane was president of both companies. The St. Joseph Company claims to own 63,401 shares of the outstanding stock of the Doe Run Company. The Doe Run Company had for some time prior to the institution of this action been under the control of the original incorporators, and the affairs of the Doe Run Company had apparently been seriously mismanaged by them. The mismanagement was of so grave a character that a liability in a sum approximating one million dollars on account thereof was thought to exist in favor of the Doe Run Company, and suit had been brought upon that claim by appellant Holmes and others against former officials of the Doe Run Company and others. The same individuals who were sued in that action were large stockholders in the St. Joseph Company. The St. Joseph Company was also the owner of all of the capital stock of the Mississippi River & Bonne Terre Railway Company, a corporation with a capital stock of three million dollars, operating about seventy-two miles of railroad. The St. Joseph Company also owned ninety-six per cent of the stock of the Bonne Terre Farming & Cattle Company, the total capital stock of which consisted of fifty thousand shares of the par value of ten dollars each, and until the date of the dissolution of the Farmers' & Miners' Trust Company, in May, 1913, the St. Joseph Company was also the owner of 83 1/3 per cent of the capital stock of that company. It also owned mining rights in about twenty-

five thousand acres in St. Francois County, and it had numerous concentrating mills, smelters, mining shafts and the usual equipment of a lead mining company. The Doe Run Company owned about seven thousand acres of mineral land, with the usual mining equipment, and was engaged in lead-mining only. It appears from the various exhibits filed in this case that for many years prior to the institution of these proceedings, both companies had been paying dividends, either in cash or stock, in large sums.

In 1913, the St. Joseph Company desired to fund some of its outstanding obligations, amounting to several million dollars, and made arrangements with certain bankers to issue two million five hundred thousand dollars of notes for that purpose. This arrangement was conditioned, however, as follows: That the St. Joseph Company should acquire as least eighty per cent of the capital stock of the Doe Run Company, or there should be a merger of the properties of the two companies. At this time the negotiations which finally led to the litigation here involved were begun. A joint committee, composed of stockholders from both companies, was appointed to work out the details of the proposed purchase or consolidation. In March of 1913, this committee, of which Mr. Clinton H. Crane, the president of both companies, was a member, mailed to the stockholders of the two corporations a letter in the nature of a report, in which the stockholders were informed of the appointment of the committee and of the general purposes for which the committee had been appointed. In July, 1913, at a meeting of the committee held in New York City, a report was made of the proceedings of the committee up to that date, and a communication was sent by the committee to the boards of directors of the two lead companies, in substance as follows: (a) that the proposed merger of the two companies should be carried out as speedily as practicable; (b) that the assent of the stockholders of both companies should be obtained; (c) that the consolidation should be upon the following basis:

that, inasmuch as the St. Joseph Company had a capital stock of twenty million dollars, of which only ten millions had been issued, five millions of the unissued stock of the St. Joseph Company should be issued in exchange for all of the outstanding capital stock of the Doe Run Company, (d) that the consolidation should be upon the basis suggested by a consulting engineer, Mr. Finlay, which, in substance, was that in the proposed new company the stockholders of the St. Joseph Company should own two-thirds of the capital stock, and the stockholders of the Doe Run Company, should own one-third. Accompanying this report was a letter from four directors of the Doe Run Company, Messrs Jones, Camp, Parsons and Smith, in which they recommended the proposed consolidation and agreed to vote the stock which they controlled in favor of the plan proposed. With the same communication was enclosed also an agreement and proxy to be signed by the stockholders of the Doe Run Company, whereby the signers of such agreement bound themselves to agree to the proposed merger. The merger was to be effected by the purchase by the St. Joseph Company of all of the properties, or of not less than four-fifths of the stock of the Doe Run Company. In the event of the purchase of the properties of the Doe Run Company, the St. Joseph Company was to assume and agree to pay all of the outstanding obligations of the Doe Run Company, including all expenses incident to the merger, and the Doe Run Company was to be dissolved. In addition to the five million dollars of stock to be issued to the stockholders of the Doe Run Company, the St. Joseph Company was also to pay the sum of $125-000 in cash, which cash payment was to be distributed among the stockholders of the Doe Run Company in proportion to their holdings of stock in that company. The agreement embodied in the proxy, however, was optional to this extent, that it was provided that in case the St. Joseph Company declined to purchase the properties of the Doe Run Company, but should be willing to purchase the stock of that company, then the agree-

ing stockholders bound themselves by signing the proxy, to sell all of their shares of stock in the Doe Run Company, to the St. Joseph Company, and to accept in payment therefor cash and shares of stock in the St. Joseph Company, in proportion to their stock holdings in the Doe Run Company, on the basis of five million dollars in stock and $125,000 in cash to be paid by the St. Joseph Company for all of the stock of the Doe Run Company; provided, further, that the agreement should become effective in the event that the owners of eighty per cent or more of the stock of the Doe Run Company should accept the offer thus made, within three months from September 10, 1913. Within the three months period, the president of the Doe Run Company notified the stockholders of that company that the owners of more than four-fifths of the outstanding capital stock of the Doe Run Company had executed the agreement and proxy above mentioned, and stated that the annual meeting called for November 15, 1913, would be adjourned to December 6, 1913, at which time it was held at Bonne Terre, Missouri. By that time the owners of about ninety-one per cent of the capital stock of the Doe Run Company had accepted the proposed offer.

At the meeting of December 6, 1913, stockholders representing 62,062 shares of the Doe Run Company were present in person or by proxy, and a resolution was adopted which provided, in substance, as follows:

1. An approval of the acts of the board of directors in reference to the proposed merger or consolidation of the two companies, including a settlement of the case Holmes et al. v. Doe Run Company officials et al., above mentioned.

2. Authority was granted to the proper officials of the Doe Run Company to sell and deliver to the St. Joseph Company all of the assets of the Doe Run Company, upon the agreement by the St. Joseph Company to assume and pay the obligations of the Doe Run Company, including all expenses incident to the sale and subsequent liquidation and dissolution of the Doe Run Com-

pany, and upon the payment by the St. Joseph Company of the purchase price of five million dollars in stock of the St. Joseph Company, and $125,000 in cash.

3. That upon the consummation of this arrangement, the stock of the Doe Run Company should be surrendered and canceled, and the company itself should be dissolved.

Correlative action was taken on December 9, 1912, by the stockholders of the St. Joseph Company. On December 11, 1913, the St. Joseph Company notified the stockholders of the Doe Run Company that the St. Joseph Company declined to purchase the assets of the Doe Run Company, but was willing to purchase unconditionally eighty per cent or more of the capital stock of the Doe Run Company, and requested that the certificates of the Doe Run Company stockholders should be presented for transfer pursuant to the terms of the proxy above mentioned. It is claimed that, under that arrangement, the St. Joseph Company has purchased ninety-six per cent of the outstanding capital stock of the Doe Run Company.

It thus appears that the first suggestion of an outright purchase by the St. Joseph Company of the properties of the Doe Run Company was abandoned, and that the second method suggested—that of purchasing at least eighty per cent of the capital stock of the Doe Run Company—was adopted instead.

As to much of the evidence in the record before us, it will suffice to say that it tended to support the contention of the parties respectively, but the following additional facts should be stated because they are peculiarly revelant to certain of the questions we are called upon to decide.

It appears from the testimony of Mr. Clinton H. Crane, president both of the Doe Run Company and the St. Joseph Company, that the St. Joseph Company had shortly before the date of the trial, June 6, 1917, purchased a number of shares of the Doe Run Company stock, and had paid as high as one hundred and fifty

dollars per share for it. It also appears that the St. Joseph Company has sold twelve hundred shares of this stock to Mr. Hendon Chubb, at the price of one hundred and twenty-five dollars per share. This sale, however, was made for special purposes connected with the anticipated contest for dissolution and, according to the testimony of Mr. Crane, involved a profit to the purchaser of about thirty thousand dollars. The evidence seems to indicate that the Doe Run Company stock at the time of the trial was worth at least one hundred and fifty dollars per share, or fifty dollars above par.

It further appears from the testimony of this same witness that during the year 1913 the net earnings of the Doe Run Company amounted to $755,230.45. During the year 1914 the net earnings amounted to $675,385.88. During 1915 the net earnings amounted to $819,417.04, and during the year 1916 the net earnings were $2,632,-900.73. During the whole of this time the *issued* capital stock of the Doe Run Company was $6,578,300. (Appellant claims that all of the Doe Run Company stock was fully paid up, but that part of it remained unissued.)

During the corresponding years the net earnings of the St. Joseph Company were as follows: 1913, $600,-000; 1914, $646,559; 1915, $505,497.10; and 1916, $3,880,-091. In 1913 the St. Joseph Company had outstanding capital stock in the sum of $10,000,000, and this amount was gradually increased by issuing St. Joseph Company stock in exchange for Doe Run Company stock until in 1916 the amount of St. Joseph Company stock outstanding was approximately $14,094,660.

On June 1, 1916, the total indebtedness of the Doe Run Company was $135,293.59. On the same date the total indebtedness of the St. Joseph Company was $3,-049,253.05. These statistics are cited for the purpose of showing, to that extent, the relative financial standing and earnings of the two companies.

Mr. Crane also testified that there were five directors of the Doe Run Lead Company, namely, himself and Messrs. Harlan, Whitaker, Pryor and Dearing. Mr.

Crane, as stated, was also president at the same time of the St. Joseph Company. Mr. Harlan, Mr. Whitaker, Mr. Pryor and Mr. Dearing each owned one share only of the stock of the Doe Run Lead Company, which they had bought from Mr. Chubb. Mr. Chubb was the purchaser of a number of shares of the Doe Run Company stock which had been transferred to him by the St. Joseph Company for the purpose of furthering the proposed consolidation scheme. Mr. Dearing also owned 4980 shares of the St. Joseph Company stock. This stock was of the par value of ten dollars per share.

In connection with these facts, Mr. Crane testified: "We don't wish to conceal the fact that the St. Joseph Lead Company is controlling the Doe Run Lead Company at the present time."

Subsequent to the entry of a judgment in this case in the court below, the trustees, Messrs. Whitaker, Pryor, Harlan, Dearing and Crane, entered into an agreement to sell the entire trust estate of the Doe Run Company to the St. Joseph Company, for the sum of eleven million dollars (less a dividend at the rate of five dollars per share) on the following conditions:

1. The St. Joseph Company to assume and pay all debts and liabilities of the Doe Run Company except the dividend above mentioned, which was to be paid as of a date prior to the purchase;

2. To assume and perform all lawful contracts and obligations of the Doe Run Company;

3. To pay in cash its ratable portion of the expenses of dissolving the Doe Run Lead Company, and

4. To pay to the Doe Run Company stockholders the value of their stock, in cash, as fixed by that contract of sale, that is, on the basis of eleven million dollars for all the property of the Doe Run Company, or to exchange the stock of the St. Joseph Company, in lieu of cash, at the rate of 8.8 shares of St. Joseph Company stock, par value $10, for one share of Doe Run Company stock, par value $100.

This proposition was reiterated, in substance, at various times during the progress of the trial. It appears also from the testimony of Mr. Crane that the appellant Maynard at no time consented to the consolidation plan, and at a meeting of the stockholders of the Doe Run Company in May, 1915, filed written objections to it. By the evidence of the same witness, it appears that among other benefits to be derived from the consolidation was that of escaping assessment for taxation purposes of large sums under both the State and Federal income tax laws, and perhaps under other tax laws. There was evidence also that consolidation would result in large savings in the cost of operating and would be beneficial to both corporations in many other respects, which we do not think it necessary to set out in detail, for reasons which will appear in this opinion.

We think the facts stated, together with such others as may be mentioned in the body of the opinion, constitute a sufficient statement of the facts.

At the conclusion of the trial, the court rendered judgment in behalf of the petitioner, and thereupon appellants filed their motions for new trial and in arrest of judgment, which were overruled, and by proper steps they have appealed. All of the questions to which we hereafter refer were duly preserved below, and are properly before us for decision.

Respondent has filed a motion to dismiss the appeals in these cases upon the general theory that no appeal lies in proceedings of this kind.

Respondent also contends that appellants are estopped to question the validity of the decree of dissolution entered in the trial court, and for that reason respondent claims that the judgment must be affirmed.

Appellants assert that this is not a bona-fide dissolution proceeding, such as is contemplated by the statute upon which this proceeding is based, and for that reason appellants claim that the cause must be reversed.

Each of these three propositions is vital, and if either is decided in favor of the party who advances it, the de-

cision will dispose of these cases. We will consider these contentions in the order named.

I. Respondent's first contention, as stated by its counsel, is as follows:

"Three essentials must exist to entitle one to appeal from a judgment of the circuit court.

"1. There must be a judicial proceeding to ascertain and determine litigated rights.

"2. The right of the appeal must be allowed by statute, either special or general.

"3. The appellant must have an immediate personal pecuniary or property interest in the cause as *Appeal.* determined, and be aggrieved by the judgment or decree complained of, that is, his legal rights be prejudiced thereby."

Respondent insists that none of these three essentials is found in this case.

In determining this question thus presented, we turn first to our own statutes. If our own laws are decisive of this question, there is no need to resort to the learning abundantly set forth in the briefs of counsel concerning the right of appeal at common law, or the procedure in other states. We therefore cite certain pertinent provisions of our Code of Procedure (R. S. 1909).

Section 1727 is as follows: "There shall be in this State but one form of action for the enforcement or protection of private rights, and redress or prevention of private wrongs, which shall be denominated a civil action." Section 2038, relating to appeals, provides as follows: "Any party to a suit aggrieved by any judgment of any circuit court in any civil cause from which an appeal is not prohibited by the Constitution, may take his appeal . . . from any final judgment in the case." Section 2040 is as follows: "No such appeal shall be allowed unless . . . the appellant or his agent shall . . . file . . . his affidavit stating that . . . the affiant believes that the appellant is aggrieved by the judgment or decision of the court." Section 2090 defines a judgment thus: "A judgment

is the final deterinmation of the right of the parties in the action."

The first question to be determined, then, is as to the nature of this proceeding. Appellant contends that it is a civil action. The contention of respondent is that this proceeding is administrative and non-judicial in character; that the proceedings are regulated by Sections 2996 to 3000, inclusive, Revised Statutes 1909, and that those sections form a complete code of procedure in such a proceeding as is here involved.

Turning our attention to appellant's contention first, it is to be noted that Section 1727, supra, in plain terms states that all actions of the kind therein described are civil actions. The description is very broad; it relates to all proceedings "for the enforcement or protection of private rights, and redress or prevention of private wrongs." It covers practically every sort of case or proceeding affecting private rights or private wrongs. While it is recognized by the statutes, and admitted by the parties in this proceeding, that certain interests of the public are here involved, that fact is not peculiar to this class of cases and does not tend to show that this is not a proceeding affecting private rights. The same condition exists in divorce cases, for example. The statute under which this proceeding is brought contemplates the filing of a petition containing allegations of certain issuable facts; it provides for issuing a summons and for an order of publication, and adversary parties are brought into court in order that they may show cause against the granting of judgment. Provision is thus made for contesting issues of law or fact, and for the hearing of evidence, in order that the court may render a judgment granting or refusing a dissolution, as the law and the facts may determine. The judgment so to be rendered may destroy the life of the corporation concerned, and may deprive the stockholders of their stock and compel them to take their distributable share of the assets in cash, thus completely changing the nature of their property and compelling the dissenting

stockholders to surrender an investment which they prefer to retain. The change thus to be brought about may, and, in the case at bar, actually does involve many million of dollars. Furthermore, the statute, in certain matters specifically directs that the procedure of the trial court shall be "according to the practice therein," and before a decree or dissolution is authorized, the court must be "satisfied that the prayer of such petition can be granted without prejudice to the public welfare, or to the interest of the corporators or the creditors of such corporation." If a judgment of dissolution is entered, a trust is then created embracing all of the assets of the corporation and trustees are appointed to administer the trust. The voluminous record before us is bodily evidence that many and complicated issues of law and fact may arise in such a proceeding, requiring much time and great care for their proper hearing and decision. It seems to us that this proceeding has all of the essential characteristics of a civil action and we hold that it is properly so classified.

The policy of this State with reference to the right of appeal has always been a very liberal one. [State ex rel. v. Shelton, 238 Mo. 281, l. c. 297; Nolan v. Johns. 108 Mo. 431, l. c. 435.] Indeed, by the express terms of the statute (Sec. 2038 supra) an appeal is allowed in every case unless the appeal in that class of cases is "prohibited by the Constitution." We find no constitutional prohibition applicable in this instance.

Respondent, however, contends that the final decree rendered in this cause is not a judgment within the meaning of our code. Is the decree rendered in this case "a final determination of the rights of the parties in the action"—using the word action in the sense in which it is used in the code? That the answer to that question must be in the affirmative, we think admits of little doubt. The decree in the present instance, as shown by the record before us, disposes of this proceeding in the language common to judgments in ordinary actions at law or in equity.

Final
Judgment.

It recites the entry of appearance of those parties who entered their appearance, and that certain others, althought "duly summoned" and "solemnly called," made default. Reference is made throughout the decree to this proceeding as a "cause." The decree recites "the submission of this cause," that the court "heard and considered all the evidence in the cause" and "accordingly does here and now adjudge and decree (and does enter its judgment and decree) that," etc., "in accordance with the prayer of said petition, and does here and now order, adjudge and decree that the corporate charter and franchise of said, the Doe Run Lead Company, be and the same are declared to be surrendered, dissolved and cancelled, and that the corporate existence of the said Doe Run Lead Company shall from this day forever be ended." This is followed by a paragraph directing the officers of the company designated by the statutes as statutory trustees, to take charge of the assets and affairs of the Doe Run Company and administer them, and, in the language of the decree, "to the foregoing judgment and decree defendants' Samuel R. Maynard and Robert Holmes objected and excepted." Whatever may have been the intention, certainly there is little in the language of this decree to differentiate it from a judgment of the court in cases about whose character there could be no question whatever. We have theretofore construed this statute as one calling for a "judicial determination" of the facts involved (Luehrmann v. Lincoln Title & Trust Co., 192 S. W. 1026, l. c. 1032.) Cases arising under statutes very similar to ours have been treated in other states as action in which the right of appeal existed as a matter of course. [In re Paine, 166 N. W. (Mich.) 1036; In re Hulbert, 160 N. Y. l. c. 15.]

We are constrained to hold, then, that this final decree was a final judgment within the code definition above given, and within the meaning of our statutes relating to appealable judgments, and that this is a judicial proceeding to ascertain and determine litigated rights.

As to whether or not the appellants are "aggrieved," it is urged by respondent that that fact depends upon whether or not appellants' legal rights have been prejudiced by the decree. But this is reasoning in a circle. Reasoning which holds that it shall be known in advance of an appeal, that an injury has been sustained, when the determination of that fact can only be had upon appeal, is palpably fallacious. Moreover, the affidavit for appeal requires merely that affiant shall "believe" the appellant is aggrieved by the judgment. We need not waste further words upon this contention.

**Aggrieved Parties.**

The Missouri cases cited by respondent in which it is held that an appeal would not lie, may all, we think, easily be distinguished from this case. St. Louis, etc., Ry Co. v. City of St. Louis, 92 Mo. 160, relates to the building of a railroad across state and county roads. In re Town of Arcadia, 201 S. W. 359, relates to disincorporating a municipal corporation. Hall v. De Armond, 46 Mo. App. 596, relates to the incorporation of a town, and Aldridge v. Spears, 101 Mo. 406, relates to the vacation and establishment of public highways. All of these cases, it will be observed, relate to matters essentially, and practically solely, administrative in character, and specially, peculiarly and almost exclusively affecting the general public.

Bean v. Barton County Court, 33 Mo. App. 635, and similar cases cited by respondent, relate to the granting or refusal of licenses to sell intoxicating liquors— a business which was never more than merely tolerated, if not actually discouraged, by the law, and which was strictly regulated by special and peculiar legislation. All of these cases differ widely both in their character and in the attitude of the law toward them from the case in hand. They certainly are not determinative—hardly persuasive, indeed—as applicable here.

The question of the existence of the right of appeal was not involved in State ex rel. v. Woodson, 128 Mo. 497, cited by respondent. Ackerman v. Green, 201 Mo.

231, relates to the examination of a judgment debtor in a proceeding to discover assets, a proceeding obviously intended to be summary in character, and so we might proceed to distinguish from the case at bar all of the cases cited upon this point by respondent, did space and time permit. We have considered them all, but do not think them controlling in this instance.

Appellant calls our attention to the fact that Sections 2996 to 3000, supra, contain no provision respecting the filing of any pleadings other than the petition. This is true. But if reasons against dissolution are to be presented, can any better or more orderly method of presenting them be devised, than by filing appropriate pleadings and tendering issues of law or fact? If these issues are to be determined (as they are) by a court, would not the usual and orderly court procedure be the most familar and effective way of reaching a just decision? And, finally, is not the very fact that no special provision is made for any other method of procedure, evidence of a high order 'that, so, far as applicable, the usual civil procedure should obtain in proceedings of this kind? We think so, and we think that was the legislative intent.

<span style="float:left">Pleading.</span>

Having reached the conclusion that this is an appealable civil action within the meaning of our Civil Code, it incidentally becomes important to determine whether it is an action at law or in equity. The statute upon which this action is based does not classify it. But that is also true of other actions arising under various statutory provisions, notably under the provisions of Section 2535, Revised Statutes 1909, relating to actions to ascertain and determine title. When the issues are at law, the proceeding is an action at law. If the pleadings tender equitable issues, then the case is in equity. In other words, the nature of the issues determines the character of the action. "If the issues joined, entitle the parties to an ordinary judgment at law, then, under the constitution and laws of the state, the parties are entitled to a trial by jury; but if the

<span style="float:left">Suit in Equity</span>

issues tendered are equitable in their nature and call for equitable relief, then the cause is triable before the chancellor.'' [Lee v. Conran, 213 Mo. 404 l. c. 412.] Measured by the standard thus laid down, it seems clear that, in view of the nature of the relief sought (in part, the creation and administration of a trust), as well as of the nature of the issues tendered, this is an action in equity. The parties and the trial court have so treated it. The St. Joseph Company in its answer, and the Doe Run Company in its reply to the answer of appellant Maynard, each pleads estoppel *in pais*, which is an equitable plea. We accordingly hold that this is an equitable action.

II. Respondent asserts that appellant Maynard is estopped to question the dissolution proceedings. We take from respondent's brief the following statement of facts upon which the plea of estoppel is based:

"The record disclosed that Maynard, for a number of years prior to 1912, was the owner of substantial blocks of stock in St. Joseph Lead Company and also in the Doe Run Lead Company; that he received the letter of the joint committee dated March 20, 1913, . . . advising him of the appointment of the joint com-

Estoppel.     mittee, and its plans and purposes; that he received the report of the joint committee of September 10, 1913, in due course of mail; that he also received the 'Agreement and Proxy,' also the letter from the four directors of the Doe Run Lead Company, dated September 15, 1913; that he was duly notified thereby of the report of the committee and its recommendations; that in due course he was notified of the meetings of the stockholders of the two companies to take action thereon and that he received the letter from St. Joseph Lead Company, dated December 11, 1913, notifying him that said company had elected and was proceeding to purchase not less than eighty per cent of the stock of the Doe Run Lead Company.

"In addition, by conversation with Camp, . . .. he learned that St. Joseph Lead Company had acquired

Doe Run Lead Co. v. Maynard.

the necessary stock for the purpose of the ultimate consolidation as planned. Maynard, both by letter and conference with Camp and Crane, was fully advised of the transactions between the two companies. Notwithstanding Maynard's complete knowledge of all that was being done, and was done, the record shows no objection from him at either of the stockholders' meetings of the two companies, held as follows: The Doe Run Lead Company on December 6, 1913, or St. Joseph Lead Co. on December 9, 1913, or the stockholders' meeting of the Doe Run Lead Company held October 10, 1914. His first objection was made at the stockholders' meeting of May, 1915, of the Doe Run Lead Company. During this period the Doe Run Stockholders had exchanged their shares, the St. Joseph Company had bought them, each company had materially changed the personnel of its stockholders, and each had profited by the economies of joint operations, as well as by improved methods, and aided by a greatly increased price received for its lead product both companies were prosperous.

''Maynard did not attend the stockholders' meeting held December 6, 1913, for the reason stated by him that over ninety per cent of stockholders 'had agreed to exchange their stock for, St. Joseph stock. There was no use of my going to the meeting.' ''.

The foregoing is a fair summary of the facts upon which the plea of estoppel is founded. Are these facts sufficient to constitute estoppel? We think not. The most that respondent claims amounts merely to this: that appellant stood by with full knowledge of what was intended and of the steps that were being taken to carry that intention into execution, but did noting to thwart the scheme that others had devised and were proceeding to execute. There is nothing in this record to cast doubt upon the business acumen of the experienced and skilful financiers who, under the guidance of learned counsel, were for three years engaged in perfecting the plans which were to bear fruit in a decree of dissolution. Presumptively, they knew the law and their rights under the

law. It is not claimed that appellant ever consented to their plans or participated in executing them. The complaint amounts, in substance, to a claim that appellant knew what they were planning to do and did not stop them. Estoppel *in pais* does not necessarily arise from notice and inaction alone. The essentials of estoppel *in pais* are well stated as follows:

"The cases when carefully analyzed show that all of the following elements must actually or presumably be present in order to an estoppel by conduct: 1, there must have been a false representation or a concealment of material facts; 2, the representation must have been made with *knowledge* of the facts; 3, the party to whom it was made must have been ignorant of the truth of the matter; 4, it must have been made with the intention that the other party shoud act upon it; 5, the other party must have been induced to act upon it." [Bigelow on Estoppel (3 Ed.), 484.] [See also Blodgett v. Perry, 97 Mo. 263, 1. c. 272; Harrison v. McReynolds, 183 Mo. 533, 1. c. 548.] Certain essential elements of estoppel are neither pleaded nor proven in this case.

Nor do we well see with what grace the plea of estoppel can be made by the only parties who are here relying upon it, in any event. So far as the Doe Run Company is concerned, the facts simply are that certain of its stockholders have sold their stock. This they had a right to do, and they are making no complaint. As to the St. Joseph Company, it has brought certain shares of stock, but it is neither alleged nor proven that it has lost by the investment. On the contrary, there is no small amount of evidence from which the contrary might be inferred. In order to make good a plea of estoppel, it is necessary both to allege and to prove that one has been misled to his hurt. [Acton v. Dooley, 74 Mo. 69; De Lashmutt v. Teetor, 261 Mo. 412.] In so saying, we do not overlook respondent's insistence that the results of not being permitted to bring the scheme of merger to full fruition may cause embarrassment and incon-

venience. The question is whether such ill results are properly chargeable to appellant's wrongful conduct or to respondent's own imprudence. We incline to the latter view. Appellant Maynard never agreed to the consolidation scheme and the parties knew, at least as early as May, 1915, that he was objecting to a consolidation. A careful study of this record justifies the conviction that it is a case where Greek met Greek, and there is no room for an application of the doctrine of estoppel. We rule this point against respondents.

III. Appellants assert that this is not a bona-fide dissolution proceeding such as is contemplated by the statute upon which this proceeding is based, and for that reason appellants claim that the cause must be reversed.

*Dissolution: Good Faith.*

The statute here involved provides for the voluntary dissolution of a corporation upon either of two given states of fact. The first is not applicable in this case. The second, upon which this proceeding is based, exists whenever the stockholders holding at least two-thirds in value of all the shares of stock in said corporation shall adopt a resolution favoring the dissolution of such corporation, whether said corporation be indebted or not, or whether its stock has depreciated below its par value or not." Upon the adoption of such a resolution and the filing of a proper petition, the statute (Sec. 2996, supra) provides that "such corporation *may* be dissolved by a judgment or decree of the circuit court  . . .  " (Italics ours.) The statute does not give to the majority an absolute right to procure a decree of dissolution, nor does it confer upon the minority an absolute power to prevent it. Neither does the statute vest in the majority a right, under color of dissolution proceedings, to compel the minority to take stock in a new corporation in lieu of its stock in the former one, nor has the majority a right to fix the price which shall be paid for the stock of the dissenting stockholders, and compel them to accept it. The stock

which belongs to appellants is their private property, and private property (with certain exceptions not here invoked) cannot, without the owner's consent, be taken for private use by any majority, however great, nor by the payment of any price, however large.  Our Constitution provides: "That no private property can be taken for private use, with or without compensation, unless by the consent of the owner, except for private ways of necessity, and except for drains and ditches across the lands of others for agricultural and sanitary purposes, in such manner as may be prescribed by law." [Sec. 20, Art. II, Mo. Constitution.]

In the case at bar, it is frankly stated that the purpose of the majority stockholders is to effect a consolidation of the Doe Run  Company with the St. Joseph Company.  The Doe Run Company seems to be engaged in a prosperous and promising business.  In addition to what appears in our statement of facts, we quote the following from respondent's brief.

"By the date of the trial each company had realized very large profits, the St. Joseph Lead Company had paid all its matured debts, and on December 31, 1916, had more than $2,500,000 of cash in addition to other quick assets; and the Doe Run Lead Company at date of trial had over one million in cash; and the two companies had paid dividends as follows:

St. Joseph Lead Company in 1914, two and a half per cent;

St. Joseph Lead Company in 1915, six per cent;

St. Joseph Lead Company in 1916, ten per cent, and fifteen per cent amortization;

St. Joseph Lead Company to April 30, 1917, two and a half per cent, and five per cent amortization;

Doe Run Lead Company in 1914, none;

Doe Run Lead Company in 1915, eight per cent;

Doe Run Lead Company in 1916, ten per cent, and fifteen per cent amortization.

Doe Run Lead Company in 1917, twenty per cent amortization."

It thus appears that during the four-year period immediately preceding the institution of this suit, the St. Joseph Company paid dividends amounting to forty-one per cent, and the Doe Run Company paid dividends amounting to fifty-three per cent, on the amounts of their outstanding capital stock, respectively. The majority proposes to permit all of the stockholders of the Doe Run Company to become stockholders on fair terms, as respondent claims, in the St. Joseph Company, or to pay to the stockholders of the Doe Run Company who refuse to come in, the fair value of their shares of stock in the Doe Run Company. In either event the St. Joseph Company becomes the owner of appellants' stock. Under the circumstances, are appellants bound to accept either of these propositions? So long as the constitutional provision above cited remains a part of the fundamental law of this State, we think they are not. That they cannot be compelled to exchange their stock for other stock, needs no demonstration. That they cannot be compelled to sell their stock, is equally clear. It is true that if a dissolution is had and all of the assets of the company are converted into cash, appellants finally are compelled to accept money in lieu of stock. But their stock is by that method paid—not sold. It is extinguished—not transferred to another. That that result may be brought about by a real dissolution, is one of the incidents contemplated when the stock was brought. It is a part of the implied contract between the stockholders. Such a result is not a violation of the contract. But to permit that result to come to pass in consequence of a pretended dissolution, is to permit a thing not originally contemplated and which is in violation of the contract between the stockholders. It is a taking of private property for private use, in defiance of the Constitution. Or, to phrase the same thought otherwise, the stockholders buy their stock charged with notice that the corporation may be dissolved upon the application of two-thirds of the stock if, in the judgment of the court, dissolution can then be effected "without prejudice to

. . . the interest of the corporators," to use the language of the statute. But corporators includes minority as well as majority stockholders, and it cannot fairly be said that the minority interests are not prejudiced if minority corporators are compelled to accept cash for their stock merely because the majority desires to own all of the stock. The statute contemplates that the power of dissolution vested by it in the holders of two-thirds of the stock shall be exercised by them in good faith for the benefit of all of the corporators, and not to the prejudice of any, and when an attempt is made by the majority to exercise that power for the benefit of less than all of the corporators, then the power fails. Any other construction makes the statute a weapon in the hands of the majority, for the oppression of the minority, and this was never intended.

Moreover, the dissolution statute contemplates a sale of the assets, a payment of the debts, if any, and a distribution of the remainder of the proceeds among the stockholders—an administration of the assets of a defunct corporation, to put it bluntly. But the St. Joseph Company is shown by this record now to be offering to perform all lawful contracts and obligations of the Doe Run Company, and to pay all of its indebtedness, including the costs of dissolution, except appellants' proper proportion of those costs—relatively a trivial sum. Practically all that remains to be done, upon respondent's theory, is to "administer" the assets sufficiently to pay off the dissenting stockholders, and consolidation will be an accomplished fact. Can consolidation be effected under our statutes in this way? Manifestly it cannot. Suppose both of these corporations were Missouri corporations, organized as the Doe Run Company is, and as the St. Joseph Company would have to be if it were a Missouri corporation, under the article relating to manufacturing and business corporations, could they, even by unanimous action, effect a consolidation by having one corporation buy all of the stock of the other and then dissolve the corporation whose stock had been sold?

We think not.  Such a proceeding would be illegal and contrary to public policy as that policy is declared in our statutes.  Section 3360, Revised Statutes 1909, provides the method by which such consolidation may be effected, and Section 3662 of the same chapter and article expressly *limits the right of consolidation to corporations organized solely for manufacturing purposes.*.  These two corporations are not within that category.  The expression of the legislative will embodied in Sections 3360 and 3362, and in Sections 2996 to 3000, inclusive, supra, is declaratory of the public policy of the State respecting the consolidation and dissolution of corporations.  Consolidation and dissolution may be effected as in these statutes provided and not otherwise.  The rule by which the extent of the powers of a corporation is determined was aptly stated by WILLIAMS, J. (then Commissioner), in Fishing & Hunting Club v. Kessler, 252 Mo. 424, l. c. 433, as follows: ''It is a well-settled rule that when the organic or statutory law specifies the powers a given corporation may exercise, or the property it may hold, such specification by implication excludes all other powers or rights, except such incidental or subordinate rights and powers as may be necessary to an exercise of the powers and rights expressly given.''

[See also State ex inf. v. Mo. Athletic Club, 261 Mo. 576, l. c. 599; Millinery Co. v. Trust Co., 251 Mo. 553, l. c. 575.]

If two Missouri corporations not engaged *solely* in manufacturing could not lawfully effect a consolidation, then it seems quite clear on principle, that a foreign corporation, acting in concert with a domestic corporation, in a proceeding in our courts, based upon the provisions of our statutes, cannot do so, particularly when neither of them is engaged *solely* in manufacturing. To countenance such a proceeding would be to extend privileges to foreign corporations which the State denies to its own citizens.  If this were permitted, it would amount to a virtual repeal of our statutes relating to the consolidation of corporations.  But we are not left

without definite guidance on this point. Section 3037, Revised Statutes, 1909, in express terms provides that foreign corporation doing business in this State shall be subject to all the restrictions imposed by our laws upon domestic corporations of like character, and shall have no other or greater power. Since two non-manufacturing domestic corporations cannot consolidate, it is certain that a domestic corporation cannot consolidate with a foreign corporation, when neither is engaged solely in manufacturing.

Furthermore, under the provisions of Section 2999, supra, the officers of the Doe Run Company, if a decree of dissolution is granted, become the trustees of all the assets of the corporation. Trustees for whom? They become trustees for the Doe Run creditors and stockholders and are in duty-bound to sell the assets to the highest bidder and for the hightest price obtainable. But it is patent upon the face of the record before us that these officials stand committed to the plan of consolidation. The very heart and soul of that plan is that the St. Joseph Company shall become the owner of all of those assets, and the Doe Run Company is avowedly controlled by the St. Joseph Company. Self-interest on the part of the St. Joseph Company demands that these assets should be bought at the lowest possible price. The very officials who are to act as statutory trustees, are part and parcel of the means whereby consolidation is to be carried out. Two of them are large stockholders in the St. Joseph Company and expect to profit by the consolidation and have for several years been laboring to effect it. The other three are merely nominal stockholders in the Doe Run Company. We would not intimate that the officials of the Doe Run Company are not honorable men. We mention the incongruous position in which such a trusteeship would place them only for the reason that it evidences the fact that the law never intended that such an incongruity should exist. [Hill v. Rich Hill Coal Mining Co., 119 Mo. 9, l. c. 23.] It never would exist in a bona-fide dissolution proceeding.

The fact that a court of equity would probably have power to appoint other trustees, and in this way, or perhaps by other methods, prevent injustice to the minority stockholders (a question about which we express no opinion) may indicate a remedy, but does not lessen the force of the argument. This predicament, abhorrent to the law, grows out of the attempt to distort the statute from its plain purpose, and to do by indirection what cannot be done directly. It cannot be that the Legislature intended that a statute which was designed merely to facilitate a bona-fide dissolution should be used as an easy method of affecting a consolidation, particularly when one of the avowed purposes of this proceeding is to enable the interested corporations to evade certain revenue laws of the State. Dissolution means a going out of business, a cessation of business activity—business death, in short. Sections 2996 to 3000, supra, were designed to furnish means of accomplishing that end. Consolidation implies continued life and increased activity. "Over all things certain, this is sure indeed" that business death is the thing farthest from the intention of the St. Joseph Company, and the will of the St. Joseph Company is the will that controls this proceeding, though it is brought in the name of the Doe Run Company. "The voice is Jacob's voice, but the hands are the hands of Esau." To use a somewhat gruesome metaphor, what is here being attempted is not corporate suicide, but corporate homicide. It is equally plain that the statute by which the St. Joseph Company seeks to attain that end was never intended to be used to permit one corporation to take the life of another. We think that the statutes relating to the dissolution of corporations contemplates a dissolution in fact as well as in name. Dissolution is used in its ordinary sense and meaning, and is to be so construed. As defined by Webster, dissolution means, "act or process of dissolving or breaking up; separation into component parts; disorganization." Consolidation, by the same authority, is "solidification; combination; strengthening." Whether

or not a decree of dissolution should be granted in a given case, then (other requirements of the law being satisfied), depends upon the simple question of the good faith of the proceeding, and that is a question to be determined upon the facts of each particular case. A determination of the question of good faith does not necessarily involve an inquiry into the motives of either group of stockholders with reference to the effect of dissolution upon themselves or upon the other group. By saying that the proceeding must be in good faith, we mean that it must appear upon the face of the record (using that term in its broad sense), that the suit for dissolution is such a suit as is contemplated by our statutes; that is, that the dissolution sought must be a bona-fide dissolution, intended to culminate in a cessation of corporate life and a distribution of corporate assets. Anything else is a fraud upon the law which the courts will not countenance. If our statutes relating to the consolidation and dissolution of corporations are not sufficiently elastic to meet the needs of modern business, relief from that evil must be sought through new legislation rather than through an erratic and dubious construction of existing laws. In the case in hand we think (speaking in legal phraseology, and not as implying moral obliquity) that the proceeding is not in good faith. It is an attempt to use the law of dissolution as a law of consolidation. This cannot be done. This view has been sustained in other jurisdictions upon reasoning so terse, lucid and comprehensive, and upon facts so closely analogous that we feel justified in adopting the arguments as our own, and we therefore quote liberally from them.

The identical question here involved was presented, under a statute very similar to our own, in a suit brought for the dissolution of a corporation in the State of Washington. The Supreme Court of that state said:

"If it appeared from the testimony in this case that this was an attempt to dissolve the corporation, and legal requirements had been complied with, the duty of

the court to adjudicate such dissolution would be plain; for it is no doubt true that, when the stockholders entered into the contract by which they obtained their stock, they must be held to have contracted with reference to the law which gave a two-thirds majority of the stockholders power to dissolve the corporation.

"But as we read the record in the case, there was no attempt to dissolve the corporation, and it cannot be said to have been within the contemplation of the contract that a two-thirds majority, or any majority, had a right to juggle with the corporation and the law. The object of the law is a beneficial one, and is to prevent a small minority from unduly influencing the corporation and preventing its dissolution, under circumstances unfavorable to its existence. But the record here shows conclusively that no real cause for dissolution existed; that the corporation was making money and prospering in every way; and, while this would probably not be a sufficient reason why a court should not grant the dissolution, it bears upon the question of whether or not there was an actual intent to disincorporate. . . . It is not enough to say that appellant received all his stock was worth. He embarked in this business, and a right to stay in the business during the expressed life of the corporation, or until it was dissolved by a fair compliance with the law." [Theis v. Spokane Falls Gaslight Co., 34 Wash. 23, l. c. 28, 29, 30.] In the same case the court quoted with approval the following paragraph from Cook on Corporations:

"And certainly if the purpose of such dissolution is not the bona-fide discontinuance of the business, but is the continuance of that business by another new corporation, then the rule is that a dissenting stockholder may prevent the sale, even though it is made with a view of dissolution of the corporation. This is the law as laid down in the well-considered case of Kean v. Johnson, 9 N. J. Eq. 401. Such a dissolution is practically a fraud on dissenting stockholders. It seeks to do indirectly what cannot legally be done directly." [Cook on Corporations, sec. 670.]

It should be noted that in the Theis case, the Washington statute peremptorily declares that upon the adoption of a proper resolution by two-thirds of the stockholders, the court *"shall* enter an order" of dissolution. Our statute, as we have said, provides merely that the court *may* enter such an order.

A similar question arose in the case of Ervin v. Oregon Railway & Navigation Co., 27 Fed. 625, 1. c. 629 and 630, wherein the court, in referring to the promoters of a somewhat similar plan of consolidation, said:

"'They never contemplated winding up the business of the old company, and distributing the assets among its stockholders, otherwise than as a formal mode of doing what they could not do by legal sanction. What they intended to do, and what they practically did, was to effect a consolidation of the old company with the new, using as the means for the end the statutory power which authorized a majority of stockholders to dissolve the corporation, settle its business, and dispose of its property. . . .

"It cannot be denied that minority stockholders are bound hand and foot to the majority in all matters of legitimate administration of the corporate affairs; and the courts are powerless to redress many forms of oppression practiced upon the minority under the guise of legal sanction, which fall short of actual fraud. This is a consequence of the implied contract of association, by which it is agreed, in advance, that a majority shall bind the whole body as to all transactions within the scope of the corporate powers. But it is also of the essence of the contract that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those powers to pervert or destroy the original purposes of the corporation. [Livingston v. Lynch, 4 Johns. Ch. 573; Hutton v. Scarborough Cliff Co., 2 Drew. & S. 514; Brewer v. Boston Theatre, 104

Mass. 378; Keane v. Johnson, 9 N. J. Eq. 401; Rollins v. Clay, 33 Me. 132; Clinch v. Financial Corp., 4 Ch. App. 117; Clearwater v. Meredith, 1 Wall. 25.] It is for this reason that the majority cannot consolidate the corporation with another corporation and impose responsibilities and hazards upon the minority not contemplated by the original enterprise, unless express statutory authority for this purpose is conferred upon the majority. It is no more repugnant to the purposes of the association to permit the majority to merge and consolidate the corporation with another corporation than it is to permit them to dissolve it, and abandon the enterprise for which it is created, when no reasons of expediency require this to be done. A dissolution under such circumstances is an abuse of the powers delegated to the majority. It is no less a wrong because accomplished by the agency of legal forms.''

A statute very similar to our own is found in the laws of the State of Michigan. As in Washington, the Michigan statute says that upon certain facts being made to appear, ''a decree *shall* be entered.'' A suit was brought under that statute for the dissolution of a mining corporation. The right to dissolve was given by the statute whenever the directors should for any reason deem it beneficial to the stockholders that the corporation should be dissolved. The directors of the petitioning corporation in that instance so resolved and filed dissolution proceedings accordingly. It was alleged in the petition, in substance, that another corporation had offered to bind itself to purchase the property at a price which would enable the stockholders of the petitioning corporation to obtain a larger annual return in perpetuity than could be realized by them from the operation of the corporation during the lifetime of the mine. The court said:

''We therefore have before us a petition to dissolve a corporation under the statute in order that a holding company, another corporation, may acquire, by force of dissolution proceedings, what it has been unable to

283 Mo.—44

acquire by purchase or exchange, in the open market. It does not appear to be the intention to dissolve the corporation and discontinue the business of mining and distribute its assets among the stockholders, because beneficial to them, nor does it appear to be desired because of any inherent physical or financial weakness in the organization or its property, but it appears to be desired for the reason that the Copper Range Company may become the owner of all the shares instead of a portion of them. The idea back of this desire is said to be that the cost of operation can be materially reduced if the property can be operated as a unit with Baltic and Champion. This may be so, and perhaps is commendable as a business proposition, but it is no measure of respondent's rights. . . .

"It is not conceivable that the Legislature ever intended that the statute should be used for such a purpose. To give the statute this construction would open the way to the majority interest of every corporation in the state to dispose of an offensive minority in the same way if it saw fit. Such a construction would be injurious to the public interest and not beneficial to the stockholders as a whole. For a similar case upon the law and facts, and one which answers many of the arguments of the petitioner in this case, see Theis v. Spokane Falls Gaslight Co., 34 Wash. 23, 74 Pac. 1004." [In re Paine, 166 N. W. (Mich.) 1036, l. c. 1038, 1039.]

Since the question here involved is new in this State and is one of importance, we may be pardoned, perhaps, for prolonging this opinion by quoting from another case strikingly similar to the case in hand. In Riker & Son v. United Drug Co., 79 N. J. Eq. 580, decided in 1912, the board of directors of the United Drug Company, a New Jersey corporation, incorporated another company by the same name under the laws of Massachusetts, and the latter company then offered to purchase all of the property and assets of the New Jersey corporation, subject to all of its indebtedness, and to pay therefor by issuing stock of the Massachusetts corporation. A dis-

Doe Run Lead Co. v. Maynard.

solution of the New Jersey corporation was contemplated as one of the steps in the reorganization. Certain objecting stockholders of the New Jersey corporation sought to enjoin these proceedings, but were denied relief in the trial court, and appealed. The New Jersey Court of Errors and Appeals said:

· "Manifestly the prime purpose of the scheme outlined in this communication is not the winding up of the New Jersey corporation and the distribution of its assets, or the proceeds of the sale thereof, among its stockholders, but the absorption of that company by the Massachusetts corporation, the transfer not only of its assets but of its business, to that corporation, and the future carrying on of that business by the Massachusetts corporation under the name of the defendant company. The scheme, in its essence, whatever it may be in form, is not a plan for the reorganization of the New Jersey company, nor even for the winding up of its business · and its dissolution within the meaning of the latter words as used by our Corporation Act, but is a scheme for its merger into or consolidation with the Massachusetts corporation. [State v. Atlantic City and Shore Railroad Co., 77 N. J. Law (48 Vr.) 466, 483.]

"Consequently, the fundamental question now to be decided is whether a corporation of this state, organized under our General Corporation Act, may legally be merged into or consolidated with a corporation created by and organized under the laws of a sister state. The answer to this question seems to us not to be in doubt. As was said by this court in Colgate v. United States Leather Co., 75 N. J. Eq. (5 Buch.) 229, the power of corporations to consolidate and merge is not to be implied, and exists only by virtue of plain legislative enactment; and no statute of our state can be found which authorizes the proposed scheme. The only right given, by our legislature, to two or more corporations to merge or consolidate into a single corporation, is expressly limited to those which are organized under the laws of our own State. [Revised Corporation Act, Paragraph

104; P. L. 1896, p. 309.] The proposed plan for the so-called 'reorganization' of the defendant company is, therefore, in violation of the law of the state whose creature it is; and, this being so, any stockholder who refuses to consent thereto is entitled to the aid of a court of equity to prevent its being carried into execution. Each stockholder of the company owns a share on its property and assets, and is entitled to have a proportionate share in its profits. They have invested their capital in it, and in it alone, and they are entitled to every dollar that it earns. This is the agreement of the stockholders among themselves. They each contract with the other that their money shall be employed for the purpose specified in the certificate of incorporation. and for no other purpose, and that the profits of the enterprise shall be ratably apportioned among them. In the absence of legislation permitting a variation of the provisions of this fundamental contract, by vote of a majority of the stockholders, no majority, however large, has a right to divert any part of the joint capital, however small, to any purpose not consistent with and growing out of this original, fundamental agreement. [Black v. Delaware & Raritan Canal Co., 24 N. J. Eq. (9 C. E. Gr.) 456, 463; Mills v. Central Railroad Co. of New Jersey, 41 N. J. Eq. (14 Stew.) 1; Colgate v. United States Leather Co., supra.]

"The scheme, in the carrying out of which the dissolution of the company is a proposed step, is a fraud upon the statute (the word is used in a legal, not a moral sense); and every act done in the furtherance thereof, no matter whether it be legal, standing alone, or not, is equally a fraud upon the statute. This being so, the complainants were entitled to an injunction to restrain the proposed invasion of their rights under the contract of incorporation, as soon as it was made manifest that such invasion was in fact contemplated." [Riker & Son, supra, l. c. 582 et seq.]

Doe Run Lead Co. v. Maynard.

The case was reversed and remanded with instructions to enjoin the proposed proceeding. All of the twelve members of the court concurred.

The same reasoning upon the same proposition may be found in White v. Kincaid, 149 N. C. 415; New Orleans, etc., R. R. Co. v. Harris, 27 Miss. 517; Abbott v. American Hard Rubber Co., 33 Barb. (N. Y.) 579; Forrester v. B. & M. Min. Co., 21 Mont. 544, l. c. 562, and in numerous cases from other states. The statutes upon this subject differ widely in the various states, and the decisions must be studied in the light of those · statutes. In some cases, the requisite number of stockholders is given an absolute right to a decree of dissolution, as in Louisiana; in others, as in Washington and Michigan, though the statute is peremptory, the court nevertheless exercises a discretion, as we have pointed out, and in still other states, as in Missouri, the court *may* grant such a decree upon the vote of a given majority of the stockholders.

In fairness, it should also be said that numerous and respectable authorities lend color to respondent's contention, but none is so pertinent upon the facts here involved as the cases above cited, which support the contrary view. The cases which tend to support respondent's contention are Bowditch v. Jackson Co., 76 N. H. 351, Am & Eng. Ann. Cases, 1913 A. 366; Tanner v. Lindell Ry. Co., 180 Mo. 1; Treadwell v. Salisbury Mfg. Co., 7 Gray, (Mass.) 393, 66 Am. Dec. 390; and a line of authorities cited in those cases. The case of Tanner v. Lindell Ry. Co., supra, is distinguishable from the case at bar in material respects, both as to the law and the facts. For one thing, the dissenting stockholders in that case declined to reveal the amount of stock held by them, and the court treated them as the owners of but one share each of the aggregate par value of $200, and, in effect, applied the maxim, "*De minimis lex non curat.*" In the case at bar, appellants' stock is shown by the record to be worth approximately $165,000. Further, in the Tanner case the plaintiffs stood by and

saw all of the assets of the Lindell Railway Company sold and transferred to another, corporation and remained silent until after the purchasing corporation had leased all of the property, amounting to "many millions of dollars" to still another corporation, and had also issued bonds in the sum of $45,000,000, secured by a mortgage upon the property purchased from the Lindell Company and other property. The plaintiffs sought to have all of these proceedings rescinded and cancelled solely upon the bare legal proposition that the Lindell Railway Company had no power to dispose of all of its assets without the unanimous consent of its stockholders. The good faith of the proceedings was not questioned. This court thereupon said: "There is nothing in a court of equity for the plaintiffs upon the case above stated." The decision was obviously just, but it turns upon a widely different state of facts from that with which we are called upon to deal in this case, and announces no principle in conflict with those here announced. We will not prolong this opinion by discussing the cases from other jurisdictions cited by respondent, but, (leaving that task to the discriminating reader), will content ourselves with saying that to us they have not brought conviction.

We have endeavored to weigh the authorities well. As a result, we are persuaded not only that the weight of authority is in favor of the conclusion herein announced, but what is more important, we think our conclusions are in accord with right reason and even-handed justice—and that in law "is the immediate jewel of the soul."

Something is said in the briefs about the difficulty or impossibility of restoring the *status quo ante*. That difficulty, if it exists, is the result of an attempt to wrest the law from its purpose, as we construe it, and to violate its spirit while professing to observe its letter. Such attempts do not commend themselves to the indulgence, nor deserve the assistance of the court. But we think the difficulty is exaggerated. The St. Joseph Company is in undisputed ascendency in both corporations, and

we incline to the belief that it has loosed no force which it cannot bind. Both corporations have always been closely allied and dominated by certain "family groups." There seems to have been no material shifting of power. But these questions we do not now hold in judgment. Numerous and interesting questions which we have not discussed have been ably briefed and argued in briefs aggregating nearly one thousand pages. These questions it is not now necessary to decide, and prudence dictates that we should reserve our views upon them until their determination becomes necessary.

After careful study, we have come, not without difficulty, but at last with confidence, to the conclusion that, for the reasons stated, this cause should be reversed. It is so ordered. All concur; *Williams J.*, in the result. *Woodson, J.*, absent.