## UNGRICH v. UNGRICH et al.

(Supreme Court, Appellate Division, First Department. March 5, 1909.)

1. TRUSTS (§ 230*)—MANAGEMENT OF TRUST ESTATE—PURCHASE BY TRUSTEE—VALIDITY—ESTOPPEL TO DENY.

While a trustee cannot deal to his personal advantage with the trust estate, yet a cestui que trust cannot allege an act on the part of his trustee to be a breach of trust which has been done under his sanction, procurement, or concurrence.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 230.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. TRUSTS (§ 231*)—MANAGEMENT OF TRUST ESTATE—PURCHASE BY TRUSTEE—VALIDITY.

Where a cestui que trust assented to a purchase by the trustee of the trust estate, and the evidence showed that the price paid by the trustee was adequate, and there was nothing to show representations as to rents produced by the property or of anything in connection with the property except its value, and the cestui que trust had knowledge of the value of buildings and building sites, and he understood the effect of the instruments executed by him in the transfer to the trustee, the cestui que trust could not set aside the sale, though the trustee made large profits by his purchase.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 231.*]

3. TRUSTS (§ 231*)—MANAGEMENT OF TRUST ESTATE—PURCHASE BY TRUSTEE—VALIDITY.

Where a cestui que trust sanctioned and assented to a purchase by his trustee of the trust estate, the trustee to hold title was not required to show that the cestui que trust ratified the transfer after having been informed of the facts and the law.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 231.*]

4. TRUSTS (§ 298*)—ACCOUNTING—JURISDICTION.

The proper forum to adjust a controversy as to whether a testamentary trustee has properly managed some of the personal estate in his hands is in the Surrogate's Court on a regular accounting by the trustee.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 298.*]

Appeal from Special Term, New York County.

Action by Martin L. Ungrich against Henry Ungrich, Jr., and another, individually and as executors and trustees of Henry Ungrich, deceased. From a judgment for plaintiff, defendants appeal. Reversed, and new trial granted.

Argued before INGRAHAM, McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Edward W. S. Johnston, for appellants.
L. Laflin Kellogg, for respondent.

HOUGHTON, J. Henry Ungrich died, leaving a will by which he gave to his executors and trustees all of his property, which consisted largely of real estate, in trust, to sell at their discretion and convert into cash and pay the one half part to his son, defendant Henry, Jr., to whom it was given absolutely, and to hold the other half for the use of the plaintiff Martin Louis, his only other child, during his life, and on his death to pay the principal to Henry, Jr., if living, or his issue, or, in default, to certain designated persons. Until a sale of the real property was made, one-half the net income was to be paid to the plaintiff. The son Henry and a nephew, the defendant Martin, were named as executors and trustees, and they rendered quarterly statements to the plaintiff of the income from the real property and disbursements connected therewith, and paid him one-half the net rentals for something over a year. Discussion was had between the plaintiff and the defendants respecting a sale of all the real property, and resulted in a deed of conveyance from the trustees to one Davenport for an expressed consideration of $157,000, who gave back purchase-money mortgages on the various parcels aggregating

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

$78,500, being one-half the purchase price with interest at 4 per cent., and immediately executed a conveyance subject to these mortgages to the defendant Henry. The purpose of the transfer to Davenport was to get title in Henry, who had agreed to purchase at the amount specified. A settlement as to the personal property was arranged at the same time or shortly thereafter, and for four years the plaintiff accepted the interest from the mortgages without complaint. Meantime Henry, after making certain improvements, had sold some of the parcels at a loss, and one, known as the Lenox avenue property, at a very large profit, so that in the aggregate he received upwards of $100,000 more than he paid for the property. Upon learning of this outcome of the transaction, the plaintiff brought this action to declare the conveyance to Henry unlawful, and in contravention of his duty as trustee, and to impose a trust in favor of plaintiff upon one-half the profits obtained by him, and for the removal of the defendants as trustees and the substitution of another in their place. The trial resulted in a judgment to that effect, the learned trial court finding that the plaintiff was induced to agree to the transfer as he did through the concealment by Henry of the true value of the property which he found to be much greater than the consideration paid, and because of solicitation and importunity and unfair advantage taken by him without knowledge on the part of the plaintiff as to his rights. We are of the opinion that the findings are clearly against the weight of evidence, and that the judgment must be reversed.

The testimony on the part of the defendants, which the plaintiff does not seriously, if at all, contradict, discloses that very shortly after his father's death, and upon receiving statements as to rents from the real property and disbursements connected therewith, the plaintiff complained of the uncertainty of his income and the amounts expended upon the property, and his own letters as early as June, 1901, show that he was contemplating a sale of all the real property, and desired a specific description so that he might draw correct diagrams for the use of appraisers. Such descriptions were furnished him, and he shortly wrote from the mountains where he was spending his vacation that he had done nothing yet with respect to having an appraisal, but there was time enough, and he follows his communication by letters in January, saying that he wanted the defendant Henry to meet him with respect to an offer for all the property of between $140,000 and $150,000, with only $7,500 cash paid, balance in mortgage, which he personally thought too low, and for a specific statement as to two of the parcels because some man wanted to buy them as an investment. The defendant Henry expressed a desire to buy one of the parcels, and frequently said he wanted the matter settled up either by a sale to himself or at auction or to some third party. All these communications and conferences resulted in the plaintiff and the two defendants meeting in the office of the attorney for the estate in February, 1902, and the plaintiff announcing that because of the uncertainty as to his income and the expense incident to holding the real property he wanted it sold. The attorney informed them that the trustees must sell it at a fair market price, and suggested that each one separately get an appraisal, telling the plaintiff to get some one to

·appraise it so that the trustees would receive a proper amount. Final-ly, according to the testimony of the attorney, they all agreed that he should procure an appraisal by Mr. Phillip H. Smyth, a real estate man familiar with values in the locality of the property, and who was unknown to and not connected with any of the parties. This was thereafter done, and he made separate appraisals which aggregated $152,000. On May 9th following, all parties met again in the office ·of the attorney, having the appraisal present, and discussed the price and who should buy. Purchase by Henry was discussed, and the at-torney informed the defendants that they could not sell it to one of themselves, and the plaintiff remarked, in substance, that, if he was satisfied, he did not see who could object. The codefendant Martin Ungrich said that if the two brothers, the plaintiff and the defendant Henry, Jr., were satisfied, he did not see why he should object to Henry buying, but insisted that the price should be $5,000 more than the appraisal, making it $157,000, and that the interest on the mort-·gage should be more than 4 per cent., and that, if Henry bought any, he should buy all, and not select the best, and that personally he ·thought the property should be held. The defendant Henry insisted that, by reason of the income from the property, he would not pay ·more than 4 per cent. on the mortgages, and that his appraisal was less than the price proposed to be given. It was finally agreed that for the purpose of transferring the property to Henry a deed should be given by the trustees to a clerk in the attorney's office, who should give back mortgages bearing 4 per cent. distributed over the various parcels for half the amount, and a contract to that effect on the 16th of May was drawn up and signed in duplicate. After this contract had been read, the plaintiff was asked if it was satisfactory to him, and, on his saying it was, the attorney said he would write on it "con-·tract approved by me" for plaintiff to sign, and the attorney wrote the words on the one contract, and the plaintiff wrote the words on the duplicate, and the plaintiff signed them both. At the same time it was agreed that the rents should be figured to June 1st. In addi-tion to this approval of the contract, a formal paper which the plain-·tiff signed was drawn, reciting that the defendant Henry proposed to purchase all the real property for the consideration of $157,000, and stating that the sale to him was made at plaintiff's request and with his consent and approval and full knowledge, which sale plaintiff rati-fied and confirmed, and this paper was signed and acknowledged by plaintiff on the 22d day of May, 1902, on the same day of the giving ·of the deed to Davenport and of his conveyances to the defendant Henry. On the 24th day of April, 1903, about one year thereafter, the plaintiff and his wife executed to the defendant Henry at his re-·quest, because title was questioned by a proposed purchaser, three sep-.arate deeds of conveyance covering all the real property in controversy. After the 22d of May, 1902, when the title sought to be impeached ·was transferred, accountings in the Surrogate's Court were had by the executors, of which the plaintiff had notice, which showed the sale of the property, the amount received, and the amount held in trust. De-·.fendant Henry made improvements on one parcel, and the plaintiff

brought action to recover for services performed by him in preparing plans therefor and recovered judgment which was paid.

Plaintiff's real estate experts testified that in May, 1902, the real property in question was of greater value than $157,000, and that that price was inadequate. From the situation disclosed by the record, however, it is manifest that, if the defendants had sold the property in good faith to a third party for that sum, they could not have been held liable for not obtaining a greater amount or selling the property prematurely. The subway was in process of construction in the city of New York at the time of the conveyance, and how much its operation would increase the value of property was problematical. Besides, it is apparent that the defendant obtained an extraordinary price because he chanced to find a purchaser who particularly desired the one piece of property. The finding of the learned trial court that the price was inadequate is not supported by the facts and circumstances.

Of course, it is true as a bald proposition that a trustee cannot deal to his personal advantage with the property of his trust. It is likewise true that a cestui que trust cannot allege an act upon the part of his trustee to be a breach of trust which has been done under his sanction or procurement or concurrence. Butterfield v. Cowing, 112 N. Y. 486, 20 N. E. 369; Vohnmann v. Michel, 185 N. Y. 420, 78 N. E. 156, 113 Am. St. Rep. 921. At the time of the transactions of which the plaintiff complains, he was of full age, an architect by profession, employed at least part of the time by one of the leading architects of the city of New York in apparent good health, and in the possession of his mental faculties. While his habits had been irregular to such an extent that he had given his father much trouble, his letters indicate that he had reformed, and in them he takes occasion to upbraid his brother, the defendant, for wrongfully criticising his conduct, and the testimony is explicit that he was not under the influence of liquor at any of the times when negotiations were had or the papers executed.

No misrepresentation as to rents which the property produced is claimed to have been made, or of anything in connection with the property except its value. Being an architect, he must have known something of building and building sites, and in the face of the overwhelming testimony and evidence contained in the record it is idle for him to claim that he did not understand the effect of the papers which he was executing, and that he did not sanction and approve of the transfer of the property to his brother, who was one of the trustees under the will of his father. It was not necessary in view of the facts disclosed for the defendants to prove a ratification as though all that was done had been done without his knowledge and assent as the learned trial court appears to have assumed. The rule that to fasten ratification upon a cestui que trust he must not only have been made acquainted with all the facts, but apprised also of the law, and how such facts would be dealt with by a court of equity, has no application to the situation presented. The plaintiff having sanctioned and assented to the transaction and concurred in the transfer of the property to his brother, and having understood all the facts and no

deception having been practiced upon him, he is bound by such sanction, and cannot repudiate it notwithstanding the defendant Henry may have been guilty of a technical violation of his trust, and may by good fortune have largely benefited by the purchase.

Complaint is made with respect to the management of some of the personalty in the defendant's hands. Nothing is shown in that regard sufficient to cause the removal of the trustees or to invoke an accounting in the Supreme Court. Whatever differences existed appear to have been settled; but, if not, the proper forum to adjust whatever may remain is the Surrogate's Court on a regular accounting by the trustees.

Our conclusion is that the judgment must be reversed upon the law and the facts, and a new trial granted, with costs to the appellants to abide the event. All concur.