[Civil No. 2630.   Filed October 15, 1928.]

[270 Pac. 1044.]

M. F. GARRETT and WINIFRED E. STEVENS, Formerly WINIFRED E. GARRETT, Appellants, v. REID–CASHION LAND & CATTLE COMPANY, a Corporation, GARRETT SHEEP COMPANY, a Corporation, F. A. REID, J. A. CASHION and J. W. SULLIVAN, Appellees, and REID–CASHION LAND & CATTLE COMPANY, a Corporation, Cross-Appellant, v. RICHARD GARRETT, a Minor, by OTTO STEVENS, Guardian ad Litem, Cross-Appellee.

248

Messrs. Cornick & Crable, for Appellants and Cross-Appellee.

Messrs. Baker & Whitney, for Appellees and Cross-Appellant.

ROSS, C. J.—This is an action by nonconsenting minority stockholders of the Garrett Sheep Company, a domestic corporation, to set aside a merger of said corporation with the Reid-Cashion Land & Cattle Company, also a domestic corporation, and to have the assets of the Garrett Sheep Company reconveyed to it or in lieu thereof for the value of the plaintiffs' shares of stock in the Garrett Sheep Company at the time of the merger.

A summary of the facts of the case is as follows:

Prior to 1918 a Mr. Garrett and his family were engaged in the sheep business, their ranges being in Yavapai and Coconino counties, Arizona. The business was operated as a partnership under the name of the Garrett Sheep Company. Some time before 1918 Garrett *père* died, and the business passed to

his wife and children. In September, 1918, the Garrett family joined the defendants F. A. Reid, J. A. Cashion, J. W. Sullivan, and one J. W. Markham, in forming a corporation of the same name as the partnership, to wit, Garrett Sheep Company, the Garretts contributing to the capital all of their livestock business, including equipment, sheep, and grazing lands, and Reid, Cashion, Sullivan, and Markham contributing in sheep and grazing lands, so that the holdings were in the proportion of 1,218 shares to the Garretts and 1,782 shares to the others distributed as follows: M. F. Garrett (mother), 486 shares; Arthur E. (son), 487 shares; Alan M. (son), 245 shares; F. A. Reid, 581 shares; J. A. Cashion 445½ shares; J. W. Sullivan, 445½ shares; and J. W. Markham 310 shares.

The original assets were capitalized at $300,000 but that they were not worth that much seems conceded. One witness says that the assets at that time were really worth about $125,000, and that the greater value was placed on them to avoid excess profit taxes. Arthur E. Garrett, who was elected the first president of the corporation, died within a month, and Cashion was elected, and from then on was its president, Sullivan its secretary, and Reid its treasurer and general manager. When Arthur E. Garrett died, the 487 shares passed to his wife, Winifred, and his son, Richard, in equal portions.

In the same general division of the state, Cashion, Reid, Sullivan and Markham, both before and after 1918, were carrying on a livestock business in the corporate name of Reid-Cashion Land & Cattle Company. These individuals owned all the stock of this corporation, were its board of directors, and filled the same official positions in it as they did in the Garrett Sheep Company. This corporation was capitalized at $750,000.

In the same part of the state were two other corporations engaged in the livestock industry, to wit, the Woolf Cattle Company and the Simpson Sheep Company; and Reid, Cashion, Sullivan and Markham were majority stockholders in these also, and composed a majority of their board of directors, and filled in them the same offices as in the Garrett Sheep Company and the Reid-Cashion Land & Cattle Company.

In 1922 the individual defendants Reid, Cashion, and Sullivan, together with Markham, who were the owners of all of the stock of the Reid-Cashion Land & Cattle Company and of a majority of the stock of the other three companies, concluded that they would merge all these corporations into one of such companies, to wit, the Reid-Cashion Land & Cattle Company, and accordingly called meetings of the directorates and of the stockholders of each of such companies, to be held at Seligman, Arizona, general headquarters of all such companies, on December 27, 1922, to consider such merger upon the terms submitted by them. At such meetings a majority of the stock voted in favor of such merger, and instructed the officers and directors of the different corporations to take the necessary steps to perfect the proposed merger. In such plan it was provided that the Garrett Sheep Company should sell and convey to the Reid-Cashion Land & Cattle Company all of its property and assets in exchange for certain portions of the stock of the purchasing corporation, and that, as soon as the Garrett Sheep Company should receive and distribute to its shareholders such purchase price, it should be considered as dissolved. At such meetings it was also voted by the stockholders of the Reid-Cashion Land & Cattle Company, Woolf Cattle Company, and Simpson Sheep Company that the Reid-Cashion Land & Cattle Company should amend its articles of incorporation by in-

creasing its capital stock to $1,100,000, divided into 11,000 shares of the par value of $100 per share, the purpose being to pay the merged companies for their assets, or their stockholders for their stock, out of such increase.

The same stock interests entered into an agreement that the Reid-Cashion Land & Cattle Company, after the merger was fully effected, could float a bond issue for $525,000, secured by a first mortgage to the First Securities Company and Blythe-Witter Company, of Los Angeles, on the consolidated assets.

The present plaintiffs voted against the merger, as also the other named resolutions.

The proponents of the consolidation or merger exhibited at such meetings estimates of the net values of the assets of all such corporations and on the basis thereof allotted the stock of the consolidated company. In other words, the total net values for the purposes of consolidation were fixed at $1,057,099.44, contributed as follows: By the Reid-Cashion Land & Cattle Company, $731,806.51; Garrett Sheep Company, $171,376.86; Woolf Cattle Company $98,048.14; Simpson Sheep Company $55,867.93. Taking the contribution of each of said companies as the basis of the calculation, the constituent companies were allotted stock in the consolidated company as follows: Garrett Sheep Company, 1,756; Simpson Sheep Company, 572; Woolf Cattle Company, 1,005 shares; and the stockholders of the Reid-Cashion Land & Cattle Company retained the 7,500 shares for which it was originally capitalized—making the total stock issue 10,833 shares out of the total capitalization of 11,000 shares.

At the time the outstanding indebtedness of the Reid-Cashion Land & Cattle Company was $507,799, or nearly forty per cent of the gross value of its assets. The outstanding indebtedness of the Garrett Sheep Company was $19,704, or ten per cent of

the gross values of its assets; while the other two companies appear to have owned about twenty-five per cent of their gross assets. The bond issue was to take care of these indebtednesses, that of the Reid-Cashion Land & Cattle Company being somewhat pressing. These bonds were later issued and sold, but the purchasers were fully advised of the merger proceedings and of the protests made by the plaintiffs herein against such merger.

On June 21, 1923, and as soon as the necessary legal steps could be taken to amend the articles of incorporation of the Reid-Cashion Land & Cattle Company increasing its capital stock, and the form of securing the consent of the Arizona Corporation Commission to the merger and bond issue was gone through with, F. A. Reid, the treasurer and general manager of all of these companies, and who seemed to have charge of the merger plan, notified plaintiffs that certificates of stock in the Reid-Cashion Land & Cattle Company had been sent to the Bank of Arizona, at Prescott, Arizona, to be delivered to them upon their turning over to the bank the certificates of shares held by them in the Garrett Sheep Company. One thousand seven hundred fifty-six shares of the stock of the Reid-Cashion Land & Cattle Company, used to pay for the assets and property of the Garrett Sheep Company, were distributed to the stockholders of the latter in the ratio of their shares to the total number of shares in such company, so that plaintiff M. F. Garrett received for her 486 shares 284½ shares. Winifred Garrett Stevens for her 243½ shares 142½ shares, and Richard Garrett for his 243½ shares in the Garrett Sheep Company 142½ shares in the Reid-Cashion Land & Cattle Company.

The value of the livestock and lands of each of the corporations was arrived at upon a standard of reckoning exclusively selected and determined by the

proponents of the merger, but we believe that such standard is conceded to have been fair and equitable, except, perhaps, in one item entering into the assets of the Reid-Cashion Land & Cattle Company. That was the item of goodwill, fixed at $143,000. The calculations of the interests of the different stockholders in the consolidated company were made upon values including this item. If it should be deducted, the net contribution of the Reid-Cashion Land & Cattle Company to the merger would be reduced by that amount, as would the net assets of the merger. If the goodwill is not an element of value to be considered, the distribution of the stock of the consolidated company was made on a wrong basis, and resulted in a discrimination against the stockholders of all the absorbed companies, including the individual plaintiffs.

The only excuse given by those who inaugurated and carried through the merger was that the business of the corporations could be operated as one company more economically than as four. It appears that the years just preceding the merger and those succeeding it were universally hard, trying years for the livestock industry.

Plaintiffs M. F. Garrett, Winifred E. Stevens, and Winifred E. Stevens as guardian of Richard Garrett, a minor, surrendered the certificates of stock owned by them in the Garrett Sheep Company, in June, 1923, and accepted in lieu thereof certificates of stock in the consolidated company. Their conduct from then on was acquiescent and submissive to the merger. They inquired of the officers about dividends, as to when, if any, would be declared. M. F. Garrett by proxy and Winifred E. Stevens in person, in February, 1924, attended a stockholders' meeting, and at this meeting the latter was elected a director. Thereafter she officially attended one directors' meeting.

The Garrett Sheep Company at the time of the merger was a solvent going concern, accomplishing in a general way the purpose for which it was organized.

This suit was filed in December, 1924, but plaintiffs had not delayed nor slept on their rights until then, for it is in evidence that they had sought legal advice as to their rights and with a view of repudiating the merger, if possible, at least six months before suit was commenced, but not before exchanging stock. The explanation made by plaintiffs for their delay in bringing suit is that they believed they were bound by the action of the majority of the stock, and that they thought they had no remedy out of the situation in which they were placed. They also explained that any subsequent acts of theirs in recognition of the consolidation were performed under the belief that they were helpless to do otherwise. The plaintiff M. F. Garrett was an elderly woman without business experience. She relied upon her husband, as long as he lived, to look after the business, and when he died she relied upon her son, Arthur E., until he passed on. Winifred E., the latter's wife, was also without business experience. These two, with ten year old Richard Garrett, the son of Arthur E. and Winifred E. Garrett, insist that their stock in the Garrett Sheep Company could not be disposed of in the manner undertaken against their protests, nor they be denied relief because of any action or inaction of theirs. Before commencing suit, plaintiffs demanded of defendant corporation and its board of directors a reconveyance to the Garrett Sheep Company of its assets, and at the time offered to surrender the certificates of stock in the defendant corporation issued to them, and upon filing complaint renewed such offer.

At the trial a jury was impaneled, and the evidence of the plaintiffs was introduced, and, after the plain-

tiffs had rested, the defendants moved for judgment based upon the failure of the evidence to support the complaint. This motion was granted as to plaintiffs M. F. Garrett and Winifred E. Stevens, but denied as to Richard Garrett, the minor. By agreement, the jury was dismissed, and the court then took evidence as to the value of the minor's shares of stock in the Garrett Sheep Company and entered judgment for such value against the Reid-Cashion Land & Cattle Company, with interest at six per cent from the first day of December, 1924, and for one-half the costs.

The plaintiffs M. F. Garrett and Winifred E. Stevens have appealed from the judgment denying them relief, and the defendant Reid-Cashion Land & Cattle Company has cross-appealed from the judgment in favor of the minor Richard Garrett.

The case was dismissed as to the three individual defendants, upon their motion.

From the foregoing statement of facts, it is obvious what the contentions of the parties must be.

The appellee Reid-Cashion Land & Cattle Company maintains that its directors and shareholders, who also owned a majority of the shares of the stock in the Garrett Sheep Company, a solvent and going concern, had the legal right to sell all the assets of the latter company to the former and accept in payment thereof the purchasing corporation's stock, based upon values and ratios fixed by it. It is contended this may be done against the protest of the minority shareholders of the Garrett Sheep Company and violate no right of such minority. Appellee further contends that, should such position be found untenable, appellants, by their delay in bringing suit, by their laches, and by their acquiescence in and recognition of the consolidation after it was effected, have waived their legal right to question such consolidation or the method and means employed to

effect it, and are estopped to deny its validity and binding force.

The appellants M. F. Garrett and Winifred E. Stevens base their right to have the judgment reversed and entered in their favor upon the proposition that the majority stockholders of a going concern, such as the Garrett Sheep Company, cannot legally sell and dispose of its assets, without the unanimous consent of its stockholders, for stock in another corporation, because, to permit such a thing, they assert, would not only breach the corporation's contract with the nonconsenting stockholder to carry on during the life of its charter, but would compel the stockholder against his consent to go into a business or enterprise not of his own choosing. And it is said by the appellants that, if the consent of the minority stockholder is relied upon to legalize or validate such transaction, it must be a consent, not only with a full knowledge of all the facts, but also of the legal effect of such facts upon the party's existing legal rights. In other words, consent, it is said, under the erroneous belief that the majority stockholders had a right to do what was done and under the belief that the minority must submit *nolens volens,* is not a consent preventing one from asserting his right at any time before the running of the statute of limitations.

It is to be observed that what was actually done here was to merge or consolidate the four corporations into one. The purpose was not to wind up the business of any of the corporations, but to carry it on under the name of one of them, dropping the names of the three others. So those provisions of the statute, concerning the dissolution of corporations prior to the period fixed in their articles, can have no application, and the appellees' reliance upon such statutes for authority to do what was attempted is upon a broken reed. As was said by

this court in *Farish* v. *Cieneguita Copper Co.*, 12 Ariz. 235, 100 Pac. 781, where the question was similar to the one here and the construction of paragraph 772 of the Civil Code of 1901 (paragraph 2105, Civ. Code 1913), and No. 82, Laws 1903 (paragraph 2107, Civ. Code 1913), was squarely involved:

" 'Dissolution' of a corporation denotes its complete destruction, and connotates the liquidation and distribution of its assets. The reorganization here attempted did not contemplate the termination of the corporate business, nor liquidation and distribution. It was an attempt to continue the corporate business under a new corporate entity, in a foreign jurisdiction. This is not a dissolution. . . .

"It is sufficient to point out that manifestly the act [chapter 82, par. 2107] does not authorize the majority of the stockholders to give away the corporate assets, or to place upon nonassenting stockholders the necessity of being parties to a continuation of the corporate business under a new corporate franchise."

The statutory authority to dissolve a corporation by action of a majority of the stock has recently been held, in *Doe Run Lead Co.* v. *Maynard*, 283 Mo. 646, 223 S. W. 600, not to confer power on such majority to consolidate corporations, as to allow it would be to use the law of dissolution as a law of consolidation. That court said, in speaking of this point:

"We think that the statutes relating to the dissolution of corporations contemplates a dissolution in fact as well as in name. 'Dissolution' is used in its ordinary sense and meaning, and is to be so construed. As defined by Webster, 'dissolution' means, 'act or process of dissolving or breaking up; separation into component parts; disorganization.' 'Consolidation,' by the same authority, is 'solidification; combination; strengthening.' "

In *Theis* v. *Spokane Falls Gaslight Co.*, 34 Wash. 23, 74 Pac. 1004, it was said:

"A dissolution of a corporation within contemplation of the law is the death of the corporation. It means a disintegration, a separation, a going out of business. But in this case, all of the elements of dissolution are wanting. The corporation, with a slightly different name, proceeded in the same town, with the same property, the same powers, and substantially the same owners."

It must be apparent that there is a wide difference between the dissolution of a corporation and the continuing of its business under a different organization, and it must also be apparent that the law providing for dissolution does not authorize a reorganization of it by consolidation or merger under a different name. This we think effectively disposes of appellees' contention that what was done was authorized by the statute concerning the dissolution of corporations and dispenses with a further consideration of that contention. Cases in point, in addition to the above, are: *Ervin* v. *Oregon Ry. & Nav. Co.*, (C. C.) 27 Fed. 625; *Paine* v. *Saulsbury*, 200 Mich. 58, 166 N. W. 1036; *Riker & Son Co.* v. *United Drug Co.*, 79 N. J. Eq. 580, Ann. Cas. 1913A 1190, 82 Atl. 930; *White* v. *Kincaid*, 149 N. C. 415, 128 Am. St. Rep. 663, 23 L. R. A. (N. S.) 1177, 63 S. E. 109; *New Orleans, J. & G. N. R. Co.* v. *Harris*, 27 Miss. 517; *Abbott* v. *American Hard Rubber Co.*, 33 Barb. (N. Y.) 578; *Forrester* v. *Butte & M. Consol. Copper & Silver Min. Co.*, 21 Mont. 544, 562, 55 Pac. 229, rehearing 21 Mont. 544, 55 Pac. 353.

Under the common law, neither the board of directors nor a majority of the stockholders could dispose of all the property and assets of a prosperous and going concern and put it out of business before the expiration of the time for which it was incorporated, nor could a consolidation or merger be effected without the unanimous consent of the stockholders. The right to consolidate or merge two or more corporations into one, as also the right to

dissolve a corporation before the expiration of its tenure of life, if it is effectively carrying out the purposes for which it was organized, is governed by statute or charter provisions. If there is a statute or a provision in the charter governing in that respect, their terms enter into the stockholder's contract and measure his rights. We have no statute in this state authorizing the consolidation or merger of two or more corporations into one, and there was no provision in the charter of the Garrett Sheep Company giving that right. What was done was without sanction of law.

The following excerpts state the rule very succinctly and clearly:

"The power of corporations . . . is derived from the law of their creation; and they may not combine with each other, or be amalgamated, or consolidated, or be merged one into another, except by express authority of statute enacted for the purpose. . . ". *Capital Tract. Co.* v. *Offutt,* 17 App. D. C. 292, 306, 53 L. R. A. 390.

"Corporations can only consolidate when authorized by law. . . . " *Overstreet* v. *Citizens' Bank,* 12 Okl. 383, 396, 72 Pac. 379, 383.

"As a corporation must be created originally by statutory authority, any consolidation, purchase, or merger by which it acquires the franchises of another corporation must also have statutory authority." *Chicago Title & Trust Co.* v. *Doyle,* 259 Ill. 489, 492, 47 L. R. A. (N. S.) 1066, 102 N. E. 790, 791.

See, also, 14a C. J. 1056, § 3632; 14 C. J. 866, § 1323; *American Seating Co.* v. *Bullard,* (C. C. A.) 290 Fed. 896.

There is quite a difference between selling all the assets of a corporation for cash and exchanging all its assets for stock of another corporation, as was done here. In one case the implied agreement between the stockholders and the corporation to carry on the business for the period specified in the articles is violated, yet the nonconsenting stockholder will

receive his proportionate share of the assets in cash; whereas in the other the contract to carry on the business as long as it is successful and paying is breached, and at the same time the nonconsenting stockholder is forced to invest his money in a corporation under a different name, management, capitalization, and business. If the law at the time one becomes a stockholder in a corporation does not invest the majority of the stockholders with the power to sell the entire assets of the corporation, or to exchange its assets for stock in another corporation, and its articles of incorporation do not give such authority, the exercise of it by a majority of the stockholders against a nonconsenting stockholder cannot legally be done.

In *Mason* v. *Pewabic Mining Co.,* 133 U. S. 50, 33 L. Ed. 524, 10 Sup. Ct. Rep. 224, the rule denying the right of the majority of the stock to dispose of the assets of a corporation is stated (in the syllabi) as follows:

" . . . A majority of the stockholders, proposing to form a new company, have no right, as against a minority, to make an arbitrary estimate of the property of the corporation to be transferred to the new company and require the minority to go into the new company, or receive for their interest in the property of the old company a sum fixed by those who are buying them out.

"Such majority, in constituting a new company, have no right to become the purchaser of the assets of the old company at their own valuation."

Cook on Corporations (8th ed.), volume 3, section 671, states the rule as follows:

"In addition to the objections to a sale of all the corporate property to another corporation, referred to in the preceding section, there often is involved the question of whether the sale may be in exchange for the bonds and stock of the vendee company. In these days of consolidations, reorganizations, and mergers of corporations it frequently happens that

the purchase price is paid in the stock and bonds of the purchasing company. The question then arises whether the selling company has power to take stock and bonds in payment, and whether it may compel its stockholders to accept such stock and bonds upon a distribution of the assets of such selling company. The general rule has been that the stock of the vendee company received by the vendor company in payment for the property cannot be forced upon dissenting stockholders of the vendor company in a distribution of its assets. They are entitled to money. Such of them as do not wish to accept the stock of the new corporation are entitled to the value of their stock in the old corporation in cash, and may have an injunction until they are secured.''

Some of the cases whose holdings support the above proposition are: *Kremer* v. *Public Drug Co.*, 41 S. D. 365, 170 N. W. 571; *Lauman* v. *Lebanon Valley Railroad Co.*, 30 Pa. 42, 72 Am. Dec. 685; *Koehler* v. *St. Mary's Brewing Co.*, 228 Pa. 648, 139 Am. St. Rep. 1024, 77 Atl. 1016; *Buford* v. *Keokuk Northern Line Packet Co.*, 3 Mo. App. 159; *Farish* v. *Cieneguita Copper Co.*, *supra.*

Plainly stated, Cashion, Sullivan, Reid, and Markham, as the owners of the majority of the stock of the Garrett Sheep Company, as its board of directors, president, secretary, treasurer and general manager, sold and conveyed not only their interests in such company, but the interests of the minority stockholders, to the Reid-Cashion Land & Cattle Company, their own personal corporation, for a price fixed by themselves, to be paid, not in cash, but in shares of stock of the purchasing corporation, upon an adjustment of values determined by them. These individuals were both the sellers and purchasers of the assets of the Garrett Sheep Company, dealing, as one may, with his own but not with trust property. The power these individuals had over the Garrett Sheep Company was not without limitations. It

should have been exercised within the law and with due regard for the interests of the minority. Such interests cannot be ignored or treated as common prey by the majority. Under the facts and circumstances, their relation to the corporation and to the minority stockholders, and their duties and obligations arising therefrom, are very aptly and well stated by Judge SANBORN, in *Jones* v. *Missouri-Edison Electric Co.,* (C. C. A.) 144 Fed. 765, as follows:

"A combination of the holders of a majority or of three-fifths of the stock of a corporation to elect directors, to dictate their acts and the acts of the corporation for the purpose of carrying out a predetermined plan places the holders of such stock in the shoes of the corporation and constitutes them actual, if not technical trustees for the holders of the minority of the stock. The devolution of power imposes correlative duty. The members of such a combination become in practical effect the corporation itself because they draw to themselves and use the powers of the corporation. In a sale of its property, in a consolidation of the corporation with another, in every act and contract of the corporation which they cause they make themselves the trustees and agents of the holders of the minority of the stock because it is only through them that the latter may act or contract regarding the corporate property or preserve or protect their interests in it. Such a majority of the holders of stock owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property to deprive the minority holders of their just share of it or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty

and of trust which invokes plenary relief from a court of chancery.''

See, also, *Wheeler* v. *Abilene National Bank Building Co.,* (C. C. A.) 159 Fed. 391, 14 Ann. Cas. 917, 16 L. R. A. (N. S.) 892, and note; *Backus* v. *Finkelstein,* (D. C.) 23 Fed. (2d) 357; *Alabama Fidelity Mortgage etc. Co.* v. *Dubberly,* 198 Ala. 545, 73 South. 911.

In the latter case, the court, speaking of the fiduciary relation of the majority stockholders and board of directors to the minority stockholders, and the duties growing out of that relation, used this language:

''It is the settled law of this state that if the same persons, as the directors of two different companies, represent both companies in a transaction in which their interests are opposed, such transaction may be avoided by either company, or at the instance of a stockholder in either company, without regard to the question of advantage or detriment to either company. *O'Conner M. & M. Co.* v. *Coosa Furnace Co.,* 95 Ala. 614, 36 Am. St. Rep. 251, 10 South. 290; *M. & C. R. R. Co.* v. *Woods,* 88 Ala. 630, 641, 16 Am. St. Rep. 81, 7 L. R. A. 605, 7 South. 108.

''This doctrine is founded upon that rigorous rule of morality, to be found, perhaps, in every enlightened system of jurisprudence, which recognizes one of the commonest of the infirmities of human nature, and sternly forbids the unequal conflict between duty and self-interest. 'The value of the rule of equity, to which we have adverted, lies to a great extent in its stubbornness and inflexibility. Its rigidity gives it one of its chief uses as a preventive or discouraging influence, because it weakens the temptation to dishonesty or unfair dealing on the part of trustees, by vitiating, without attempt at discrimination, all transactions in which they assume the dual character of principal and representative.' *Munson* v. *S. G. & C. R. R. Co.,* 103 N. Y. 58, 74, 8 N. E. 355, 358. In the administration of trusts this is one of the master principles of equity.''

Appellee Reid-Cashion Land & Cattle Company contends that the stock appellants got in return for the stock surrendered was of an equal value.

"It is not enough to say that appellant received all his stock was worth. He embarked in this business, and had a right to stay in the business during the expressed life of the corporation, or until it was dissolved by a fair compliance with the law." *Theis* v. *Spokane Falls Gas Light Co.*, 34 Wash. 23, 74 Pac. 1004.

On its face, this last contention looks improbable. Before the merger, the Garrett Sheep Company, with gross assets of $191,000, owed $19,000, or approximately ten per cent of its capital. The Reid-Cashion Land & Cattle Company, with gross assets of $1,239,000, owed $507,000, or approximately forty per cent of its gross assets. After the merger the total gross assets were approximately $1,620,000, and the mortgage indebtedness $525,000, only $19,000 of which was chargeable to the Garrett Sheep Company. Under the merger, the debt was approximately thirty-three per cent of the consolidated value, whereas before the capital of the Garrett Sheep Company was encumbered to about ten per cent of its gross value. There ought to be a more ready and better market for the stock of a corporation owing only ten per cent of its capital than that of a corporation owing thirty-three per cent of its capital.

The purchasing corporation, through its owners, Reid and associates, credited itself with $143,000 for "good will"—upon what legal or equitable principle we cannot understand. At the time of the merger, such corporation was engaged in breeding and raising cattle only, whereas the Garrett Sheep Company was engaged in the breeding and raising of sheep only. Even if the former's reputation as a grower of cattle had some cash value when confined to that business, it is difficult to see how such repu-

tation or goodwill could benefit the grower of sheep. The item of goodwill, under the circumstances, was of no value to the corporation engaged in the sheep business, and its inclusion as an asset of the purchasing corporation was, to say the least, unjustified.

Upon no theory of the law can the merger be held as binding upon the minor child, Richard Garrett, because his stock in the Garrett Sheep Company was exchanged by his guardian for stock in the Reid-Cashion Land & Cattle Company without any authority, order, or direction from the probate court, and such exchange was never confirmed by such court. The guardian could not have lawfully sold such minor's stock in the Garrett Sheep Company for cash without authorization from the probate court, much less exchange it for stock in another company. But it would hardly comport with actual facts to say the guardian, in going through the form of making such exchange, intended it as a substitution for the ward's interest. It would more nearly conform with the actual situation to say she complacently acquiesced in what she had not been able to avoid, and accepted the substituted stock for the child as the only thing to do under the circumstances, and as evidence to trace and locate the minor's former interest in the Garrett Sheep Company.

Under the law, a minor child is regarded as a ward of the court, and the guardian is, in effect, its arm, and both are subject to the court's control. It is the duty of a guardian of the property of a ward to keep it safely. Par. 1125, Civ. Code 1913. He may sell his ward's real estate or personal property upon a proper showing of necessity and after "obtaining an order therefor." Par. 1146, Id. It is his duty to report sales for confirmation, and this seems to include sales of personal as well as real property. Pars. 1146–1161, Civ. Code 1913. None of the safeguards of the law devised for the protec-

tion and conservation of the property of the ward was observed.

The purchasing corporation obtained no title to the assets of the Garrett Sheep Company as against the nonconsenting stockholders and in taking over such assets against their protest became, at least so far as their interests were concerned, their trustee, under a duty, when called upon, to return such assets to the Garrett Sheep Company or to account to the nonconsenting stockholders for the value of their stock, unless for some sufficient reason such nonconsenting stockholders have lost the right to demand such relief. It is obvious the minor child, Richard, did not lose his right to sue for the value of his stock, because he was incapable of giving consent to the merger and likewise of ratifying it, and the acts of his guardian in handling his interests could, in no view, deprive him of his property in the Garrett Sheep Company or of a remedy to recover its value from the trustee.

If there is a difference in the rights of the minor and the rights of the two women appellants it is due solely to the accident of the former's minority. In all other respects the facts are the same. But for the difference in the fact situation, the law declared in behalf of the minor would control the rights of the two appellants. We have seen that the minor neither consented to nor ratified the merger. This was because of his legal incapacity to consent or because the law governing the guardian in the matter of a sale of personal property of his ward was not followed. So far as the women are concerned, neither of these impediments is in the way; they were of age and capable of giving consent to the merger. They did not consent to the merger or consolidation unless it be held that their surrender of their stock and the acceptance in lieu thereof of the stock of the purchasing company should be construed to be consent by ratification. This exchange

occurred on June 21, 1923, over six months after the merger was completed. The act of increasing the capital stock of the purchasing company and the bond issue against the consolidated assets were carried out before the exchange. It cannot be said these things were done on the faith of consent by appellants; they were all done against their consent. It cannot be claimed the acceptance of the stock of the purchaser influenced or caused in the slightest the merger, the increased capitalization, or the giving of the mortgage to secure the bond issue. Neither the purchaser nor its owners, Reid, Cashion, Sullivan, and Markham, were misled by such exchange. The appellee is not therefore in any position to suggest or claim that it was induced to take such steps by reason of any conduct of appellants, because it appears appellee acted in direct opposition to appellants' expressed wishes and in total disregard thereof. The question, then, it seems to us, reduces itself to this: Have the *cestui que trustent,* who have accepted certificates of stock of the consolidated company, the right under the circumstances to tender such certificates back and receive the value of their property as of the time of its conversion by the trustee? The evidence is undisputed that the former were not trained in business and did not know the legal effect on their rights of the transaction absorbing the Garrett Sheep Company by the Reid-Cashion Land & Cattle Company—that, indeed, they believed they were bound by the action of the majority stockholders, and acted under that belief in accepting such stock—that it was "half a loaf" or nothing. The yardstick employed to measure the rights of parties dealing at arm's length is not the proper measure of the rights growing out of fiduciary relations. If it were, perhaps these minority stockholders would be remediless. The trustee owes certain duties to his *cestui que trust* that he must

observe, and among them is the duty not to sell to himself the trust property. This duty was breached. Reid, Cashion, Sullivan and Markham were in fact both companies, since, as majority stockholders and managing and directing officers, they bodily took over the exercise of their functions. They were in contemplation of law both the seller and purchaser. As trustees of the minority stockholders, they owed it to such stockholders to disclose, not only all the facts, but to inform them, especially in view of their being women without business experience or familiarity with corporate law, of their legal rights. A claim of ratification by the *cestuis que trustent,* here based on the mere fact that they accepted the proffered stock in the consolidated company, is not founded in justice, and we believe has no support in the law.

The rule that we think should be applied to the facts of this case is as stated in *Adair* v. *Brimmer,* 74 N. Y. 539, loc. cit. 553, 554, and is as follows:

"To establish a ratification by a *cestui que trust,* the fact must not only be clearly proved, but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances, and also in a case like the present that the *cestui que trust* was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter. Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The *cestui que trust* must therefore not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up in equity by a trustee against his *cestui que trust,* must be proved, and will not be assumed. The maxim, *'ignorantia legis excusat neminem,'* cannot be invoked in such a case. The *cestui que trust* must be shown to have been apprised of his legal rights. *Cumberland Coal Co.* v. *Sherman,* 20 Md. 151; s. c., 30 Barb. 575; *Lammot* v. *Bowly,* 6 H. & J. [Md.] 526."

In another case it is said:

"The rule [is] that to fasten ratification upon a *cestui que trust* he must not only have been made acquainted with all the facts, but apprised also of the law, and how such facts would be dealt with by a court of equity. . . . " *Ungrich* v. *Ungrich*, 131 App. Div. 24, 29, 115 N. Y. Supp. 413, 417.

What was done by the majority stockholders in the present case was condemned by this court in *Heffern Co-operative Cons. Gold M. & M. Co.* v. *Gauthier*, 22 Ariz. 67, 193 Pac. 1021, speaking through Mr. Justice BAKER, in the following clear and unmistakable language:

"In the broader sense the holder of the majority of the stock owes to the other stockholders and the corporation the duty to exercise good faith, care, and diligence to conserve the property of the corporation and to protect the interests of the minority stockholders, and any act of his, in dealing with the property of the corporation, in violation of this duty, for his own selfish interests and gain, will not and cannot be recognized. Majority shareholders can no more, for their own benefit and advantage, appropriate the property of the corporation, than the minority shareholders, and, where the act is in itself a violation of the duty that arises from their fiduciary relation, the corporation can rescind that act. 7 R. C. L., Corporations, par. 286, and cases cited."

Transactions by interlocking directorates with trust property afford such great opportunity and temptation for misuse or perversion of power by the trustees that the courts have thought fit to promulgate the rule of placing upon them the burden of proof to show "entire fairness; and, where a sale is involved, the full adequacy of the consideration." In *Geddes* v. *Anaconda Copper Min. Co.*, 254 U. S. 590, 65 L. Ed. 425, 41 Sup. Ct. Rep. 209, the court said:

"The relation of directors to corporations is of such a fiduciary nature that transactions between

boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness and where a sale is involved the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add in the soundest business policy."

The majority stockholders not only lacked power to do what was done against the will and consent of the minority, but if they had possessed such power, it is not apparent that they have sustained the burden in the two respects above stated. Can it ever be said to be fair, much less "entirely fair," to the *cestui que trust,* to permit the trustee, where he is both the seller and purchaser of the trust property, to fix its value and compel the *cestui que trust* to accept payment of such arbitrarily fixed value, not in money, but in trade? That is exactly the situation here. What may be said of the "adequacy of the consideration"? It is not necessary to recapitulate the figures to show that the Reid-Cashion Land & Cattle Company's assets *before* the consolidation were more encumbered than afterwards, while the assets of the Garrett Sheep Company *after* the merger were burdened with a heavier debt. If the fictitious item of goodwill is expunged, as it should be, the unfairness is more glaring.

But, if it be granted that the appellants in surrendering the stock in the Garrett Sheep Company and accepting in lieu thereof stock of the Reid-Cashion Land & Cattle Company by that act gave their consent to the consolidation and agreed to accept the new situation and take their chances as to whether it would be profitable or unprofitable, still, before they would be unalterably bound thereby,

it should be necessary that they understood their "antecedent existing legal rights" when they gave their consent thereto. In *Re McFarlin et al.*, 9 Del. Ch. 430, 75 Atl. 281, the court said, in setting aside an election by a widow, induced by a mistake of law, to take dower in lieu of under the will:

"It is a general rule that a mistake of law pure and simple is not adequate ground for relief. But there are well-defined exceptions to this rule. Without undertaking to discuss the many phases of the question, it seems that a mistake by a party as to his antecedent existing legal right, as distinguished from a mistake as to the legal import of the act done, is one which should be and is recognized as a ground for equitable relief from the consequences of such mistake, where the mistake can be rectified without injury to the rights of others."

There are no "others" in the present case, except the corporations which bought the bond issue of $525,000, and they invested knowing all about appellants' protest against the consolidation and bond issue. It is clear from the evidence that appellants did not know of their antecedent existing legal rights. They believed the consolidation was legal at the time it was effected and six months later when they accepted the exchange of stock. They were under the impression that the majority stockholders had the power and right to transmute their investments from stock in the Garrett Sheep Company to stock in the Reid-Cashion Land & Cattle Company, and that they were powerless to prevent it. They were mistaken or ignorant of their existing legal right to insist on the continuance of the Garrett Sheep Company as a corporation and to refuse to accept anything in lieu thereof, and to hold that they are bound nevertheless, as much so as if they had understood the law and freely and voluntarily taken the venture, would be, it seems to us, very unjust and inequitable. We think, if there ever was

a case where relief from a mistake of law was justified, this is such a one. These two women, recently bereft of their husbands, who had looked after and cared for their business, were suddenly confronted with the responsibility themselves, without business training or experience, and under such circumstances it requires no credulity to believe their statements when they say they thought they were bound by what the majority stockholders of their company did.

The rule that permits relief to one who enters into a transaction ignorant of his antecedent existing legal rights is well recognized. It is stated by Pomeroy on Equity Jurisprudence (3d ed.), section 849, as follows:

"Wherever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relations either of property or contract, or personal status, and enters into some transaction the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact."

This rule is especially applicable to all cases involving the relation of a trustee to his *cestui que trust.* As said in Pomeroy on Equity Jurisprudence (3d ed.), section 848:

"Where an ignorance or misapprehension of the law, even without any positive, incorrect, or misleading words or incidental acts, occurs in a transaction concerning the trust between two parties holding close relations of trust and confidence, injuriously affecting the one who reposes the confidence, equity will, in general, relieve the one who has thus been injured. The relations of trustee and *cestui que trust,* guardian and ward, and the like, are examples. The relief is here based upon the close confidence reposed

—upon the duty of the trustee to act in the most perfect good faith, to consult the interests of the beneficiary, not to mislead him, and not even to suffer him to be misled, when such a result can be prevented by reasonable diligence and prudence.''

For the reasons stated, the judgment in favor of the minor, Richard Garrett, is hereby affirmed; and the judgment dismissing M. F. Garrett and Winifred E. Stevens is reversed, with directions to the trial court to proceed to take evidence of the value of their stock in the Garrett Sheep Company as of the time the assets of such company were transferred to the Reid-Cashion Land & Cattle Company, with legal interest from such date, and to enter judgment in their favor for such value, interest, and costs.

We regard the unlawful act of transferring the assets of the Garrett Sheep Company to the appellee. as a conversion of the assets of the former, entitling the appellants to legal interest from such time. *American Seating Co.* v. *Bullard,* (C. C. A.) 290 Fed. 896.

LOCKWOOD and McALISTER, JJ., concur.